In re SCOTT'S ESTATE.

LEWIS, Appellant, v. ZEIDLER, Respondent.

(248 N. W. 247.)

(File No. 7489. Opinion filed April 24, 1933.)

*Scott & King,* of Springville, N. Y., for Appellant Cora Scott Lewis.

*Millward C. Taft,* of Washington, D. C., for Respondent Minnie Scott Zeidler.

*S. K. Grigsby* and *J. G. Bradford,* both of Sioux Falls, for Security Nat. Bank & Trust Co. of Sioux Falls, Trustee.

*George B. Doyle,* of Buffalo, N. Y. (*Hugh S. Gamble,* of Sioux Falls, of counsel), for Respondent Maymie Scott Riford.

POLLEY, J.   Delos A. Scott died testate in Sioux Falls on or about the 9th day of May, A. D. 1925.   Among other provisions his will contained the following:  "Upon the death of said Wallace D. Scott an undivided one-seventh of said residue shall go in equal shares to the then surviving heirs of my deceased brother, Hiram Scott, as determined and in the proportions fixed by the laws of descent and distribution of the laws of the State of South Dakota."

Wallace D. Scott died on or about the 8th day of May, 1930, and this proceeding was instituted for the purpose of determining who are the heirs at law of Hiram Scott.   At the trial there were three claimants, each claiming all or a part of said residue.   Each of said claimants claims to be a daughter of the said Hiram Scott, and each is the child of a different woman.   Cora Scott Lewis is the daughter of Hiram Scott and Electa Hulbert Wiley, who for several years lived together as husband and wife, and who Cora claims were legally married.   Minnie Scott Zeidler is the daughter of Hiram Scott and Julia Peters, who also for several years lived with Hiram Scott as his wife, and who Minnie claims were legally married.   Maymie Scott Riford claims to be the daughter of Hiram Scott and a third woman, with whom he lived for several years, but the trial court found that this claimant was not a daughter of nor an heir of Hiram Scott and dismissed her claim.   She did not appeal and will be given no further notice.

The trial court found and decreed that Cora Scott Lewis and Minnie Scott Zeidler are daughters and heirs at law of Hiram

Scott and are entitled to the estate in equal shares. From this decree Minnie Scott Zeidler did not appeal. This leaves Cora's right to one-half of the estate fully established; but Cora appeals from the portion of the decree that decrees that Minnie is an heir and entitled to one-half of the estate. Whether Minnie is an heir at law of Hiram Scott is the only question to be determined on this appeal.

The facts relative to the marital relations of Hiram Scott with these two reputed wives, as we gather them from the record, appear to be as follows: He owned 20 acres of land on what was known as Townsend's Hill in Cattaraugus county in the state of New York. He appears to have made his home on this piece of land during practically all of his married life, though he worked about the neighborhood as a farm hand and woodchopper, a considerable portion of the time. During the year 1858 or 1859 one Electa Hulbert Wiley came to his home and Hiram and she commenced to live together as husband and wife. They continued to live together in this manner until 1873. They held themselves out to their friends as husband and wife, and were regarded as husband and wife in the community in which they resided. There is no evidence that they were ever formally married; but so-called common-law marriages were recognized in the state of New York during the period of time involved; and during said time the relations of these two people were such as to constitute a good common-law marriage, providing there was no impediment in the way of either of them entering into a lawful marriage. During the time they lived together two children were born to them, one of whom, Cora, is one of the claimants in this proceeding; and the other, a boy, Eugene, who died without issue about the year 1888.

During the summer of 1873 Electa for some reason not stated in the record left Hiram. She first went to Hamburg, in Erie county, N. Y., where she stopped a short time, then went west to some place, probably in the state of Iowa, where she lived the remainder of her life. Shortly after she left the home of Hiram Scott, Cora was taken into the home of a nearby family where she remained until she grew to womanhood.

During the summer of 1874 Hiram Scott was working for a man in the neighborhood by the name of Fuller who also lived on

Townsend's Hill, and who testified as a witness in the case. There was working for Mr. Fuller at the same time a girl who had grown up in that neighborhood by the name of Julia Peters. Hiram made love to Julia and asked her to marry him. She was willing to marry him and said she would marry him, if he would get a divorce from Electa. Hiram then took some steps, the exact nature and extent of which do not appear in the record, to procure a divorce. He went to Springville and consulted a lawyer. The evidence does not show whether he went more than once to see this lawyer. Appellant claims that he went only once and that he brought home with him on this occasion a written instrument that he claimed was a divorce. He gave this document to Julia and told her it was a divorce. She showed it to Mr. Fuller and to Mr. Fuller's wife, both of whom testified at the trial, and both of whom said that this paper was not a divorce; that it did not purport to be a divorce and that it stated on its face that it was not a divorce. They testified further that said instrument stated, among other things, that under existing circumstances Scott was entitled to a divorce. They testified also that they told Julia that the paper in question was not a divorce. It is not easy to reconcile this testimony with her conduct. She had said she was willing to marry Hiram, but told him "that he had to have a divorce before she married him." Yet, immediately after being shown this paper that Hiram said was a divorce and that said witnesses say was not a divorce, he borrowed a horse and buggy from Mr. Fuller and he and Julia drove away. The witnesses did not know where they went, but they did not go far for they returned on the same day and announced that they were married. They immediately commenced living together as husband and wife. As a result of their cohabitation, three children were born to them. Two of these children died without issue. The third, Minnie, now Minnie Scott Zeidler, is one of the claimants in this proceeding.

About the month of November, 1880, Julia Peters Scott was committed to an insane asylum where she remained until early in 1882 when she was taken to an almshouse. From there she was discharged in September, 1883, and never heard from thereafter.

Minnie Scott Zeidler is presumed to be legitimate and competent to inherit from Hiram Scott. This presumption of legitimacy is one of the very strongest, if not the strongest, pre-

sumption known to the law. Adger et al v. Ackerman (C. C. A.) 115 F. 124. It is not conclusive, however, and may be rebutted, but the person who assails the legitimacy of another has the burden of overcoming this presumption and it must be proved, as said by some courts, by evidence clear and irrefragible, and by others that the evidence must be clear and convincing; and again, that the evidence of illegitimacy must lead to a conclusion that is strong and irresistible. In re Matter of Findlay, 253 N. Y. 1, 170 N. E. 471, 473. This is a very recent case; opinion by Mr. Justice Cardozo in the Court of Appeals of New York in 1930. In the opinion, he says: "What is meant by these pronouncements, however differently phrased, is this, and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides."

In the opinion the cases on this subject, pro and con, are collected and reviewed, and no useful purpose would be served by further citation here. In the present case the trial court did not find that Hiram Scott and Electa Hulbert were ever formally married but did find facts sufficient to establish a common-law marriage, and further found that said marriage had become dissolved; and found also that during the summer of 1874 Hiram Scott and Julia Peters, a single woman, became husband and wife and lived together as such in the state of New York for about seven years. The appellant, of course, admits the marriage between Hiram Scott and Electa Hulbert Wiley, but claims that such marriage had not been dissolved at the time it is claimed that Scott and Julia Peters commenced to live together as husband and wife. In order to sustain the legitimacy of Minnie Scott Zeidler, it will be presumed that Hiram Scott and Electa Hulbert were divorced before the second marriage.

"The law presumes that this second marriage was lawful, and not criminal," and that either Hiram Scott or his wife Electa had obtained a divorce before the second marriage. Leach et al v. Hall et al, 95 Iowa, 611, 64 N. W. 790, 792. And quoting from Bishop on Marriage and Divorce, § 457, "Every intendment of law is in favor of matrimony where a marriage has been shown in evidence, whether regular or irregular; and, whatever the forms of proofs, the law raises a strong presumption of its legality, not

only casting the burden of proof on the party objecting, but requiring him throughout in every particular plainly to make the fact appear against the constant pressure of this presumption that it is illegal and void; so that it cannot be tried like ordinary questions of a fact which are independent of this sort of presumption."

In order to establish the illegitimacy of Minnie Scott Zeidler, it was incumbent upon appellant to show, First, that a valid marriage took place between Hiram Scott and Electa Hulbert Wiley; second, that both Hiram and Electa were competent to enter into a legal marriage; third, that there was no impediment in the way of their marriage; and, fourth, that the marriage of Hiram and Electa had not been dissolved.

As above stated, the relations of Hiram and Electa from the time they commenced living together were such as to constitute a common-law marriage. There does not appear to have been any impediment in the way of such marriage so far as Hiram is concerned; but as much cannot be said for Electa. She had been living with another man before she lived with Scott, a man by the name of Wiley. As the result of their cohabitation they had a son who went by the name of Horace Wiley. He is presumed to be legitimate which implies a legal marriage between Wiley and Electa, but there is no evidence that such marriage, if one ever existed, was ever dissolved. Therefore, appellant has not shown that Electa was competent to enter into a lawful marriage with Hiram, and the result is that while the marriage between Hiram and Julia may have been somewhat irregular, Cora certainly is in no position to be throwing stones at Minnie. If there was no lawful marriage between Hiram and Electa, then there was no impediment so far as he is concerned in the way of his contracting a lawful marriage with Julia Peters, and Minnie Scott Zeidler is the legitimate daughter and heir at law of Scott. This situation may throw some light upon the so-called divorce procured by Hiram Scott and shown to Julia Peters. There is no attempt to show any part of the contents of that document other than that it was not a divorce and that it showed on its face that Scott was entitled to a divorce. It may have shown the facts relative to a marriage between Electa Hulbert and the man Wiley with whom she lived, to the effect that such marriage had not been dissolved,.

in which case Scott was at liberty to enter into a legal marriage with Julia Peters. This would explain her conduct in immediately marrying Hiram Scott after she had seen this document. In fact, it is not easy to reconcile her conduct with the situation on any other ground, because she had refused to marry him as long as he was married to Electa Hulbert, and the fact that she did marry him is some evidence of the fact that she believed Scott was not then, if he had ever been, the husband of Electa Hulbert. Again, there is no evidence to show that Electa Hulbert herself did not procure a divorce from Scott. She had been gone a year or more at the time this so-called divorce was shown to Julia Peters. Electa may have established a residence in some other state and brought suit for a divorce and Hiram may have entered an appearance therein and the paper procured by Hiram from the lawyer in Springville may have been a copy of a decree of divorce procured by her. This is a much more rational explanation, in view of Julia Peters' conduct immediately after she saw it, than the explanation given by the Fullers in their testimony. But assuming that a valid marriage existed between Hiram Scott and Electa Hulbert, and assuming that said marriage had not been dissolved at the time of his marriage with Julia Peters, Minnie Scott Zeidler may still be legitimate.

There was in effect in the state of New York at that time a statute (Revised Statutes of New York [6th Ed.], vol. 3, part 2, c. 8, tit. 1, art. 1, of § 6) which reads as follows: "If any person whose husband or wife shall have absented himself or herself for the space of five successive years, without being known to such person to be living during that time, shall marry during the lifetime of such absent husband or wife, the marriage shall be void only from the time that its nullity shall be pronounced by a court of competent authority."

In response to this statute, and the absence of Electa Scott after the year 1873, the trial court made the following finding of fact: "That it was not until about nine years later that she was indirectly heard from and not until Cora Scott Lewis was fifteen years old; that not until 1900, twenty-seven years after she left, and six years after Hiram Scott's death, does there appear some direct information of her whereabouts; that she was never seen

after leaving Hamburg, N. Y., by any relative or member of her family; that, if alive, her whereabouts were never disclosed by her to Hiram Scott, before his marriage to Julia Peters or at any time thereafter; that Hiram Scott had no direct information or knowledge whether Electa Scott was living or dead after she left Hamburg, N. Y.; that as a matter of law she could be presumed to be dead."

Appellant contends that this finding of fact is not supported by the evidence. She claims that Hiram Scott knew within five years after his marriage to Julia Peters where Electa was and that he knew at the end of the five-year period after she left Hamburg that she was still living. Appellant relies wholly upon her own testimony to establish this fact. Her testimony shows a very bitter feeling toward respondent, and that her memory was very poor. She claimed to have received some letters from her mother, but had not kept any of them. She claimed to have received her mother's picture, but had not preserved that. She did not even know the state in which her mother had lived for so many years and where she died. The trial court may well have doubted the accuracy of her testimony as to when she received the first information of her mother's whereabouts. And certainly the evidence does not show that Hiram Scott ever knew where Electa was after she left Hamburg or that he knew whether she was still living. If he did not know within the five-year period after his attempted marriage with Julia Peters, and there is no satisfactory proof that he did, that Electa was still living, then his marriage with Julia became legal, and children then born, or born thereafter, would be legitimate. This principle is stated in Adger v. Ackerman (C. C. A.) 115 F. 124, 130, as follows: "The principle of law is that where parties who are incompetent to marry enter an illicit relation with a manifest desire and intention to live in a matrimonial union rather than in a state of concubinage, and the obstacle to their marriage is subsequently removed, their continued cohabitation raises a presumption of an actual marriage immediately after the removal of the obstacle, and warrants a finding to that effect. The Bredalbane Case (Campbell v. Campbell) L. R. 1 H. L. Sc. 182, 206, 212; De Thoren v. Attorney General, 1 App. Cas. 686; Fenton v. Reed, 4 Johns. [N. Y.] 52, 4 Am. Dec. 244; Hynes v. McDermott, 91 N. Y. 451, 458, 43 Am. Rep. 677; In re Taylor,

9 Paige [N. Y.] 611; Rose v. Clark, 8 Paige [N. Y.] 574; Van Buskirk v. Claw, 18 Johns. [N. Y.] 346; Caujolle v. Ferrie, 23 N. Y. 90; Betsinger v. Chapman, 88 N. Y. 487, 499; Starr v. Peck, 1 Hill [N. Y.] 270; Gall v. Gall, 114 N. Y. 109, 118, 21 N. E. 106; Donnelly v. Donnelly, 8 B. Mon. [Ky.] 113; Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Rep. 245; State v. Worthingham, 23 Minn. 528; Dickerson v. Brown, 49 Miss. 357; Floyd v. Calvert, 53 Miss. 37, 45; Jones v. Jones, 45 Md. 155; Yates v. Houston, 3 Tex. 433-450."

Upon the whole record we think that appellant has not sustained the burden of proving that Minnie Scott Zeidler was illegitimate, and that the trial court reached the correct solution of the case.

The judgment and order appealed from are affirmed.

RUDOLPH, P. J., and CAMPBELL, ROBERTS, and WARREN, JJ., concur.