74 N.W.2d 599 (1956)
ESTATE of William KESSLER, Deceased.
Andrew KESSLER, Appellant,
v.
Glenn LOERS and Ernest Stangohr, Administrators of the Estate of William Kessler, Deceased, Respondents.
No. 9512.
Supreme Court of South Dakota.
February 4, 1956.
*600 Doyle, Mahoney & Dunn, Eugene C. Mahoney, Francis G. Dunn, Sioux Falls, for appellant.
J. H. Lammers, Madison, Mumford, Mumford & Protsch, Vincent J. Protsch, Howard, for respondents.
SMITH, Judge.
Whether the evidence is sufficient to support the respective findings that (1) LeRoy Voeltz, born in wedlock, was in fact an illegitimate child, (2) William Kessler, deceased, was his father, and (3) William Kessler legitimated or adopted LeRoy Voeltz by publicly acknowledging him as his son, receiving him into his family, and otherwise treating him as his legitimate child, as provided by SDC 14.0408, are the questions presented by this appeal.
William Kessler, a bachelor, died intestate April 14, 1953. Petitions for letters of administration of his estate were filed respectively by one of the brothers of the deceased and by the guardian ad litem of LeRoy Voeltz. The county judge was disqualified and pursuant to SDC 32.0605 the proceedings were certified to the Hon. B. B. McClaskey, one of the judges of the circuit court, ninth judicial circuit. The petitions were heard together, the issues were resolved in favor of LeRoy Voeltz, and his petition for letters of administration was granted. Upon appeal, and after a trial de novo in circuit court, the Hon. R. F. Manson, presiding, the issues were again resolved in favor of LeRoy Voeltz and the letters of administration granted in accordance with his petition were confirmed. The brother of the deceased has appealed.
The mother of LeRoy Voeltz and William Kessler had known each other and had lived in the same farming community for many years. She married one William Voeltz in 1924. She and Voeltz were cousins. Prior to 1933 the mother gave birth to five children, one of whom is deceased, and two of whom are inmates of the State Hospital at Redfield. In 1933 such proceedings were had against Mr. Voeltz under our statutes dealing with feeble-minded persons as resulted in the performance of a vasectomy upon his person at the State Hospital at Redfield. On May 29, 1935, the mother gave *601 birth to LeRoy. During the period when this child was conceived, the mother and Voeltz were maintaining normal marital relations. Both the mother and Mr. Voeltz appeared as witnesses in these proceedings. She testified that William Kessler was the father of LeRoy, and Voeltz stated that she had made such an admission to him during LeRoy's early life. According to her testimony she told Kessler that LeRoy was his child shortly after the boy was born, and he gave her assurance he would help care for him. At a later time he told her that when LeRoy was older he would give him a farm and he wanted to take care of him himself. The record reveals that Kessler was a frequent caller at the Voeltz home while LeRoy was a baby. During that period he exhibited affection for him by holding him on his lap, playing with him and making presents to him. He also furnished Mrs. Voeltz money with which to purchase clothes for the baby. Among the presents he brought for the boy as he grew older was a bicycle. In 1948 Mrs. Voeltz started divorce proceedings in which she described LeRoy as a child of Voeltz. Her complaint was dismissed. In 1949 a second proceeding was started which resulted in a decree of divorce in favor of Voeltz. Again it was claimed that LeRoy was a child of Voeltz, and funds for his support were ordered paid by Voeltz for a brief period. When the mother and Voeltz were having difficulties in 1948 LeRoy was moved to the farm home of William Kessler where, except for limited periods when he was in the home of his mother, he remained until the death of Kessler.
After LeRoy came to Kessler he put him in a country school where he completed the 8th grade. Thereafter, he started him in high school but consented when the boy wanted to quit school. Down through the years he clothed the boy, supplied him with pocket money, and opened charge accounts for him. He purchased two secondhand automobiles for him, and allowed him to make such use as he desired of the farm pickup truck. On several occasions when the boy was in trouble, Kessler looked after him and signed his appearance bonds. In hiring a lawyer for him he told the lawyer that LeRoy was his boy. That statement was made in the presence of a neighbor. He made similar statements to many others down through the years. There is testimony in the record that he had said LeRoy would have all of his property. There is also testimony of other persons, including Kessler's brother, and two men who represent themselves as close friends who state that Kessler said nothing about the boy.
In December 1952 LeRoy was married. Kessler made him a wedding present of $150 in cash. He returned to the farm home with his wife, and again Kessler arranged for charge accounts. During this period he stated he was going to fix the place up and make a big farmer out of the young man.
LeRoy and a young man about his age testified to a statement by Kessler, made when LeRoy was in the 8th grade. A discussion had taken place among a group on the main street of Howard. An aunt of LeRoy pointed to Kessler and said in substance, Why don't you go by what your real dad says? Subsequently as LeRoy, his friend and Kessler were riding home, the boy asked him if that was true and he said, Yes.
The inference is that LeRoy is a normal young man. His mother testified that his features resemble those of William Kessler.
The sufficiency of the evidence to overcome the presumption that LeRoy, born in wedlock, is the legitimate son of his mother and William Voeltz is the first issue we shall consider.
The strength of that presumption was pointed out in our decision in In re Scott's Estate, 61 S.D. 253, 248 N.W. 247, 248, in these words:
"* * * This presumption of legitimacy is one of the very strongest, if not the strongest, presumption known to the law. Adger v. Ackerman, 8 Cir., 115 F. 124. It is not conclusive, however, and may be rebutted, but the person who assails the legitimacy of another has the burden of overcoming this *602 presumption and it must be proved, as said by some courts, by evidence clear and irrefragable, and by others that the evidence must be clear and convincing; and again, that the evidence of illegitimacy must lead to a conclusion that is strong and irresistible. In re Matter of Findlay, 253 N.Y. 1, 170 N.E. 471, 473. This is a very recent case; opinion by Mr. Justice Cardozo in the Court of Appeals of New York in 1930. In the opinion, he says: `What is meant by these pronouncements, however differently phrased, is this, and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides.'"
And see In re Estate of Jones, 110 Vt. 438, 8 A.2d 631, 128 A.L.R. 704, and the annotation at page 713.
Rule 703 of the Model Code of Evidence proposed to the American Law Institute, in our opinion, expresses the true meaning of our pronouncement in In re Scott's Estate, supra. The rule reads as follows:
"Whenever it is established in an action that a child was born to a woman while she was the lawful wife of a specified man, the party asserting the illegitimacy of the child has the burden of producing evidence and the burden of persuading the trier of the fact beyond reasonable doubt that the man was not the father of the child."
The primary attack upon the sufficiency of the evidence to overcome this potent presumption deals with the expert testimony upon which the finding of sterility of William Voeltz is predicated. We perceive no useful purpose to be served in detailing this testimony. The purpose of the operation was to eliminate "all possibility of procreation." Ch. 118, Sec. 2, Laws 1927. There is expert testimony in the record the trier of the fact was warranted in believing, which could have convinced him beyond all reasonable doubt, that the operation performed did produce that result, and his belief could well have been strengthened by the evidence as a whole. That we are not at liberty to disturb such a finding is elementary.
Another phase of the evidence employed by the trial court in arriving at its conclusion that the presumption of legitimacy was overcome was the statement of the mother that William Kessler was the father of LeRoy. This evidence was essential because it was shown that normal conjugal relations continued between the mother and Voeltz notwithstanding her infidelity. We are told by appellant that sound policy and authority should induce a holding that a mother cannot thus be heard to proclaim her child to be base born. Authorities supporting that contention are cited in 60 A. L.R. 380, 68 A.L.R. 421, and 89 A.L.R. 911. But cf. Wigmore on Evidence, 3d Ed. §§ 2063 and 2064. We do not review the authorities because the contention is ruled by statute in this jurisdiction.
Our relevant statutes read:
"All children born in wedlock are presumed to be legitimate." SDC 14.0301.
"The presumption of legitimacy can be disputed only by the husband or wife, or the descendant of one or both of them. Illegitimacy in such cases may be proved like any other fact." SDC 14.0302.
We digress to observe that we do not have a statute which declares the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate.
A statute identical with SDC 14.0302 supra was interpreted by the court in our sister state in State v. Fury, 53 N.D. 333, 205 N.W. 877, at page 879, wherein it wrote,
"But section 4422 does not stop when it has declared who may dispute the presumption. It goes farther, and by its last sentence provides how it may be disputed: `Illegitimacy in such case may be proved like any other fact.' It seems to us obvious that this provision was aimed directly at the incompetence *603 of the husband and wife, and that the Legislature intended thereby to render them competent, subject only to the conclusive presumption of section 7935. To hold that this is not so is to hold that these words are wholly redundant and meaningless; vagrant words, strangers to the rest of the section. Were it otherwise, there would be no necessity for them, for the presumption could be disputed in accordance with the prevailing rules of evidence."
This holding was followed in In re Wray's Estate, 93 Mont. 525, 19 P.2d 1051.
We concur. It seems manifest that by SDC 14.0302, supra the legislature intended to change the common law in two respects: on the one hand it removed restrictions directed specifically at the establishment of the fact of illegitimacy, but on the other it withheld the right to dispute the legitimacy of a child born in wedlock from all but a very limited class of persons.
The appellant places his principal reliance on In re Mills' Estate, 137 Cal. 298, 70 P. 91, 92 Am.St.Rep. 175, wherein a like statute is quoted. As authority upon the issue we are considering that case was destroyed by In re McNamara's Estate, 181 Cal. 82, 183 P. 552, 7 A.L.R. 313. Cf. Comment on Presumptions of Legitimacy and Related Problems, 23 S.Cal.L.Rev. 538 at 570.
We hold that the trier of the fact was justified in considering the testimony of the mother of LeRoy, and that the evidence of the experts and of the mother is sufficient, if believed, to create an abiding conviction beyond a reasonable doubt that LeRoy was illegitimate.
The contention that the evidence is insufficient to establish the paternity of William Kessler, being based upon the assumption that a mother is incompetent to give testimony tending to bastardize her child born in wedlock, is largely disposed of by our holding that, under our statute, the testimony of this mother was available to the trier of the fact. That her statement that William Kessler was the father of LeRoy was one of fact was indicated by this court in State ex rel. Kiihl v. Chambers, 37 S.D. 555, 159 N.W. 113. That which convinced the trier of the fact beyond a reasonable doubt that William Voeltz was without power to procreate must have created an equally strong conviction that William Kessler was the father of LeRoy, as there is no suggestion in the record that the mother was intimate with a third individual. That conviction may well have been strengthened by the evidence of the attitude of William Kessler toward LeRoy from the year of the boy's birth until Kessler's death. We are not impressed with the suggestion that the mother is so impeached by the record she made in the divorce proceedings as to justify this court in disturbing this finding of the trial court.
In our opinion the contention that the finding of paternity is against the clear weight of the evidence is untenable.
The third question is whether the evidence supports the findings and conclusion of legitimation.
The controlling statute reads:
"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such into his family, with the consent of his wife if he is married and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The other provisions of law relating to adoption shall not apply in such cases." SDC 14.0408.
The findings of illegitimacy and paternity have been considered supra. The contention under this third heading is that the evidence does not sustain the findings respectively that Kessler publicly acknowledged LeRoy as his child, received him into his family and otherwise treated him as if he were a legitimate child.
*604 By numerous persons associated with William Kessler as his employees, friends and neighbors, this story is told. William Kessler, a bachelor, owned a section of land near Howard, South Dakota. He maintained a home on that farm where he lived alone much of the time. On occasions he had hired help living with him, and he frequently entertained guests. A bachelor brother lived some sixty miles to the west in the vicinity of Artesian. Kessler was a quiet, reserved individual. Since the birth of LeRoy he had displayed unusual interest in and affection for the child. When the boy was about to enter the eighth grade Kessler took him into his home. During the first years the boy played about the place. He completed the 8th grade in a country school nearby. On some days Kessler would take him to school, on others he would drive the pickup or tractor. Although he was entered in the Howard high school, he quit in a few days with Kessler's consent. Soon he was taking part in the operation of the farm. He was given a pig and a cow. As a hired man put it, "He treated him like his own." As time went on he indulged him with money, two automobiles, charge accounts at the stores and at a service station, and perhaps too much freedom. Then came worry about the boy's behavior, and talk to a close friend about those worries and the fact the boy had not continued in high school. The boy gave a bad check in purchasing an automobile. Kessler first had a friend attempt a settlement, and finally hired a lawyer to handle the matter. On three occasions when the lad had a brush with the law Kessler signed his bond and looked after him. On one of these occasions he hired a lawyer to represent him. When the boy married he gave his consent, made him a wedding present of $150 and allowed him to bring his wife to the farm home. Again he arranged for a charge account for their supplies. During these six years, he furnished the boy with a home, clothing, food and pocket money. His treatment of this young man included thoughts for his future. After the boy was married he told a friend he was going to fix the place up, buy equipment and make a big farmer out of LeRoy. When sickness came, he told a friend he intended to arrange his affairs to leave everything to the boy.
Over the years while he was doing things for this lad he seemed not to seek out excuses for announcing that this was his child, but when occasion arose, he said, "This is my boy." In so doing he did not speak as one revealing a confidence, but as though he was willing to have the community know the fact. He told the men who worked for him off and on during those years; he told the neighbor with whom he farmed land; he told others who were just friends; he told those with whom he made arrangements for charge accounts for the boy; and when the boy was in trouble he told those whom he employed to look after his interests. While there is testimony of those who claimed to be friends that he said nothing about LeRoy, there is no testimony indicating an intentional concealment of the fact.
The one circumstance appearing in the evidence, which must have been given the trier of the fact concern, was the fact that Kessler's brother who claimed they were intimate and visited back and forth testified that Kessler had never mentioned LeRoy to him. But the brother also testified that he never had seen LeRoy to know who he was until he saw him at the undertaking parlor after Kessler's death. The court may have disbelieved this testimony. It was at liberty so to do. Houck v. Hult, 63 S.D. 290, 258 N.W. 142. And see In re Estate of Gird, 157 Cal. 534, at page 542, 108 P. 499.
Testimony which two able and experienced trial judges weighed and beheved revealed William Kessler, a bachelor, as taking this young boy into his farm home as a member of his family, and according to his homespun standards, treating him as he would have treated a legitimate son, and in addition by his conduct as a whole, and by that which he said whenever occasion arose for him to acknowledge the relationship, as evincing a desire that the community should know LeRoy as his child. In our opinion no more is contemplated by *605 this statute to accomplish legitimation by such a natural parent.
Our view is supported by the overwhelming weight of authority. The cases are collected in 33 A.L.R.2d 705, at page 741.
The contention of appellant that notwithstanding legitimation under SDC 14.0408, quoted supra, LeRoy cannot inherit because there has not been compliance with SDC 56.0105, is without merit. Eddie v. Eddie, 8 N.D. 376, 79 N.W. 856, and In re Berg's Estate, 72 N.D. 52, 4 N.W.2d 575, 140 A.L.R. 1312.
Being of the opinion that the questioned findings are supported by the evidence, the judgment is affirmed.
ROBERTS, P. J., and RUDOLPH and RENTTO, JJ., concur.
SICKEL, Judge (dissenting).
In my opinion the disposition of this case is contrary to SDC 14.0301; 14.0302; In re Scott's Estate, 61 S.D. 253, 248 N.W. 247 and Smith v. Smith, 71 S.D. 305, 24 N.W.2d 8, and I therefore respectfully dissent.