DEPARTMENT OF SOCIAL SERVICES OF the STATE of South Dakota ex rel. Roslea Ann WOLF, Plaintiff and Appellee,

v.

Robert R. McCARTY, Defendant and Appellant.

No. 17897.

Supreme Court of South Dakota.

Submitted on Briefs Jan. 12, 1993.

Decided Sept. 22, 1993.

Mary G. Keller, Beadle County State's Atty., Huron, for plaintiff and appellee.

Thomas H. Harmon, Tieszen Law Office, Pierre, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Via a complaint filed August 7, 1990, Roslea Ann Wolf (Wolf) alleged that Appellant Robert R. McCarty (McCarty) was the father of E.V.W., born to Appellee Wolf on April 4, 1990. A January 7, 1992 jury trial found McCarty to be E.V.W.'s father. Thereafter, the trial court established McCarty's child support obligations and awarded attorney fees to the state's attorney representing the Department of Social Services on behalf of Wolf. On appeal, McCarty raises two issues:

I. Did the trial court err in refusing to allow evidence of McCarty's sterility?

II. Can a part-time state's attorney be awarded fees in a state-sponsored paternity suit?

Based upon our decision in Issue I, we reverse and remand. On Issue II, we hold that it is permissible, subject to our discussion below.

### FACTS

Wolf gave birth to E.V.W. on April 4, 1990 and identified three men as possible fathers. Genetic testing through DNA profiling eliminated two of the men from contention. DNA, as explained to the jury, is shorthand for Deoxyribonucleic Acid, the genetic material which carries the coded messages of heredity that determine the appearance and physiological characteristics of an individual. With a probability of paternity of 99.89%, McCarty could not be excluded as the biological father. A second examination of his blood revealed a 99.5% probability. Furthermore, Wolf had previously denied having sexual intercourse with anyone other than McCarty during the probable period of conception. Although McCarty admits that Wolf stayed at his home one night when she was intoxicated, he denies any sexual encounter, then or ever, with Wolf.

During 1982, when McCarty worked for the Federal Drug Enforcement Agency (DEA), he was tortured by drug dealers. One such torture included the application of electrodes to his genitals, which he claims left him sterile. As this condition allegedly existed at the time of conception, he claims that he was incapable of impregnating Wolf. Although a medical expert was prepared to testify that such torture could have caused the sterility, the expert was not willing to testify to a medical certainty or probability that the condition existed at the time of the alleged conception.

McCarty's sterility was confirmed prior to trial, however, he had no knowledge of this sterility prior to a medical examination in the fall of 1991. Despite fathering a child in April of 1978, he additionally claims that the court erred in presuming that he was still fertile in 1989.

### DECISION

I. *McCarty's defense was improperly excluded.*

Over twenty years ago, this Court established the realm of admissible medical expert testimony. In *Koenig v. Weber*, 84 S.D. 558, 174 N.W.2d 218 (1970), we held, "Medical experts are qualified to express their opinions based upon medical certainty or medical probability, but not upon possibility." *Accord Armstrong v. Minor*, 323 N.W.2d 127 (S.D.1982); *Bertness v. Hanson*, 292 N.W.2d 316 (S.D.1980); *Thomas v. St. Mary's Roman Catholic Church*, 283 N.W.2d 254 (S.D. 1979). When a court-ordered examination confirmed that McCarty was presently sterile, the trial court ruled that expert medical testimony must establish with "reasonable medical certainty or medical probability" that McCarty was sterile *at the time of conception.*

Proposed medical testimony indicated that injuries McCarty received years prior to the conception *possibly* could have caused

sterility. However, McCarty conceded that the testimony could not meet the required burden of medical certainty or medical probability that McCarty was in fact sterile at the time of conception, let alone prior to 1991. Regardless, McCarty contends that because he has never had a vasectomy, has had no other children, and is presently sterile, he, therefore, has been sterile since the torture in 1982. This assumption is a gap which this Court cannot bridge. "Where the claimant's medical experts are unwilling to express an opinion, this Court will not infer a medical prognosis." *Guthmiller v. S.D. Dept. of Transp.*, 502 N.W.2d 586, 589 (S.D.1993). Conversely, the trial court placed too great a restriction on the medical expert testimony. Although the trial court properly prohibited the expert from providing medical testimony that could not meet the evidentiary standard, it erroneously denied any mention of McCarty's sterility defense. We note that a distinction exists.

In *Zepp v. Hofman*, 444 N.W.2d 28, 33 (S.D.1989), we permitted the medical expert, under the requisite standard, to give his "medical opinion as to whether the injuries were consistent with [being hit with a board]." Likewise, McCarty's expert should be permitted to testify with medical certainty or medical probability as to whether sterility is an injury consistent with torture of the genitals. Afterward, the *Zepp* expert was asked:

> Doctor, based upon a reasonable degree of medical certainty, are you of the opinion that Frank Zepp was hit in the face with a board?

As the proposed testimony indicates, a similar inquiry to McCarty's expert would reveal that there can be no medical certainty of McCarty's sterility prior to 1991. This differs from simply asking if the type of injury was probable. Accordingly, the trial court should have permitted McCarty the opportunity to plead his defense before the trier of fact, who will decide the ultimate issue.[1] Any confusion perceived by the jury, as the Department of Social Services fears, may be remedied by the art of cross-examination.

Through two separate DNA tests, McCarty's probability of paternity was determined to be in excess of 99%. Cross-examination of the DNA medical expert revealed that the probability would be the same even if McCarty had not had sex with Wolf, as McCarty so contends. DNA, the entire genetic blueprint for an individual, is extracted from samples of blood from the child. (Semen, saliva, skin, and hair follicle samples can also be used in DNA testing.) Thereafter, a "DNA profile" is developed by analyzing three to five locations in DNA where individual variations are common. Because offspring inherit roughly half their DNA from their mother and half from their father, this profile is then compared with DNA taken directly from the suspect father. *See DNA Technology in Forensic Science* (National Research Council, July 1992).[2]

In *State v. Wimberly*, 467 N.W.2d 499 (S.D.1991), we noted that the admissibility of

---

**1.** Although the dissent correctly notes that McCarty's expert witness could not establish sterility at the time of conception with medical certainty or probability, the dissent erroneously maintains that admitting testimony concerning injury to McCarty's genitals somehow alters the rigid expert medical testimony standard found in *Thomas v. St. Mary's Roman Catholic Church*, *supra*. Nowhere does the *McCarty* decision permit an expert to testify on *possibilities*.

At the trial level, no testimony concerning sterility was permitted whatsoever. Can torture to the genitals, within medical certainty or medical probability, cause sterility? If so, the expert has met the *Thomas* standard and can testify to that effect. McCarty would also be allowed to testify that he was victimized by such torture. Was he, in fact, sterile prior to 1991? McCarty concedes that his expert cannot meet the burden on this question and such testimony is inadmissible; thus, the testimony on medical *possibilities* remains prohibited.

Our decision merely allows McCarty to present those aspects of his defense which meet the *Thomas* standard for medical testimony. Then, the trier of fact is left to weigh the admissible evidence and judge the credibility of the witnesses. *Mash v. Cutler*, 488 N.W.2d 642 (S.D.1992).

**2.** This publication is available from the National Academy Press, Harris Building, 2001 Wisconsin Avenue, N.W., Washington, D.C. The National Research Council, which conducts studies and investigations in the public interest, was organized by the National Academy of Sciences in 1916 in order to provide for broader participation by American scientists and engineers in the work of the Academy. The Academy was chartered by the U.S. Congress in 1863.

scientific evidence, such as DNA profiling, was governed by the standards set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923) and held that DNA testing meets the *Frye* test. *Wimberly* at 506. Recently, however, the United States Supreme Court held "[T]he *Frye* test was superceded by the adoption of the Federal Rules of Evidence." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. ——, ——, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993). Thus, under federal law, the "'general acceptance' test in *Frye* is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence[.]" *Id.*, 509 U.S. at ——, 113 S.Ct. at 2799.

Although the admission of DNA testing in courts is a relatively new phenomenon, scientific evidence is not. Like traditional genetic tests, DNA testing can be used to determine if biological material from a known individual can be linked to a sample from another specimen (i.e., can this individual be included in or excluded from the population of humans who could have deposited the biological material). DNA is found in all body cells except red blood cells. In semen, the DNA profile is a composite of thousands of DNA molecules from thousands of sperm and therefore reflects a man's overall profile. If two specimens are from the same person, the same DNA banding pattern will be found in both. *See Genetic Witness: Forensic Uses of DNA* (U.S. Congress, Office of Technology Assessment 1990).[3] Although a consensus in the medical community finds this testing to be valid and reliable when quality assurance is employed, *Daubert* establishes that such a concensus is not necessary for evidentiary admissibility.

▆▆▆▆ In South Dakota, it is unnecessary to have a special hearing on the admissibility of DNA analysis when SDCL 25–8–7.1 provides for its admission. DNA testing has previously been recognized by this Court in *Matter of A.J.H.*, 363 N.W.2d 196 (S.D.1985) and *Matter of F.J.F.*, 312 N.W.2d 718 (S.D. 1981). Furthermore, McCarty does not challenge DNA testing as conflicting with the

admissibility standards previously required by *Frye*. Rather, McCarty challenges the evidence as confusing and violative of public policy. In paternity proceedings, trial court's findings will not be set aside unless they are clearly erroneous in light of the evidence. *State ex rel. Maeschen v. Wittstruck*, 377 N.W.2d 137 (S.D.1985). McCarty's arguments concerning DNA admissibility are without merit.

▆▆▆▆ McCarty further notes that the trial court proclaimed the sterility defense to be an affirmative defense under SDCL 15–6–8(c) and held there is a presumption of fertility. Although this statute lists several affirmative defenses, sterility is not one of them. Simply stated, an affirmative defense is a response to an admitted act; however, McCarty completely denies having sexual intercourse with Wolf. Hence, no admitted act exists. Additionally, we find no authority cited requiring a presumption of fertility. Therefore, we find no reason to deem it true. SDCL 15–26A–60(6); *Corbly v. Matheson*, 335 N.W.2d 347 (S.D.1983). At this time, this Court finds no sound reason to add sterility, by judicial fiat, to the list of affirmative defenses.

No purpose is served when the defendant in a paternity suit is not permitted to present evidence of sterility. Here, the testimony should have been admitted, and then the jury would decide what weight or credibility such a defense would merit. *Nelson v. Palmquist*, 363 N.W.2d 570 (S.D.1985).

II. *Attorney fees are permissible.*

At the trial level, the part-time state's attorney was awarded fees in this state-sponsored paternity suit. Although the award has been dismissed due to our remand of the first issue, we find it appropriate to address this question due to judicial economy, as it is certainly capable of repetition on remand.

▆▆▆▆ Ordinarily, a state's attorney cannot receive additional payment for performing services he or she is obligated by statute to provide. Under Art. XII, § 3 of the South

---

**3.** The Office of Technology Assessment (OTA) is an analytical arm of Congress. OTA's basic function is to help legislators anticipate and plan

for the positive and negative impacts of technological changes.

Dakota Constitution, the Legislature "shall never grant any extra compensation to any public officer ... nor authorize the payment of any claims or part thereof created against the state, under any agreement or contract made without express authority of law ..." We hold that SDCL 7–16–23, set forth below, is in line with the Constitution and expressly authorizes the compensation for part-time state's attorneys:

> Other than fees for child support enforcement services made upon the request of the department of social services to a state's attorney under a cooperative agreement with his board of county commissioners, and fees payable under contract for representation of the county or its officers in civil cases and administrative proceedings outside the county pursuant to § 7–16–6, a board of county commissioners may not give or pay any fees or costs to a state's attorney as part of his salary or in addition to his salary; provided, however, each board shall participate in the costs of the prosecution and enforcement by the state's attorney of support obligations against any responsible parent, whether of a civil or criminal nature, on a fee for service basis with the department of social services. The fee is paid to the state's attorney in addition to any other compensation of the state's attorney for the performance of his other public duties. A full-time state's attorney, as defined by § 7–16–19, is not entitled to receive the fees payable for child support enforcement services authorized by this section nor shall a full-time state's attorney be entitled to extra compensation for representation of the county or its officers in civil cases and administrative proceedings outside the county pursuant to § 7–16–6.

■ As the statute plainly provides, a state's attorney may receive additional fees for child support services. However, the statute's final sentence specifically precludes full-time, *not* part-time, state's attorneys from receiving the compensation. Thus, by inference, a part-time state's attorney may receive such compensation provided an agreement exists with the board of county commissioners. Furthermore, paternity proceedings are necessarily included as child support services.

In 1992, the South Dakota Legislature enacted SDCL 15–17–38, which states in pertinent part:

> The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce, annulment of marriage, *determination of paternity,* separate maintenance, support or alimony. (Emphasis added.)

■ To hold that the establishment of paternity falls outside the scope of "child support services" is not reasonable; without proof of paternity, support would be unenforceable. Whereas trial courts have broad discretion in awarding attorney's fees, *Schmidt v. Schmidt,* 444 N.W.2d 367, 370 (S.D.1989), an award such as this is permissible.

Reversed and remanded.

MILLER, C.J., and AMUNDSON, J., concur.

SABERS, J., concurs specially.

WUEST, J., dissents.

SABERS, Justice (concurring specially).

I concur on Issue I because the trial court erred in refusing to allow evidence of McCarty's sterility. Therefore, I see no need to discuss the *Frye* test or DNA testing. *See Daubert,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (discarding the *Frye* test which was superseded by the adoption of the Federal Rules of Evidence).* I would not reach Issue II on attorney fees.

No purpose is served in having a trial on paternity if the defendant can not show evidence of sterility. The Mother identified three men as possible fathers. McCarty

---

* "Rule 702, governing expert testimony, provides: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.' " *Id.,* — U.S. at —, 113 S.Ct. at 2794.

could not be excluded as the biological father because the probability of paternity ranged from 99.5% to 99.89%. McCarty denies *any* sexual encounter with Mother. He claims he was tortured by drug dealers in 1982 by application of electrodes to his genitals. He and his wife attempted to have additional children after 1982, but were unsuccessful. Two separate fertility tests conducted upon McCarty for purposes of trial revealed he is sterile and a medical expert was prepared to testify that the torture could have caused the sterility.

The trial court excluded all evidence of McCarty's sterility, which included the application of electrodes to his genitals, his wife's inability to conceive after he was tortured, and the medical expert's testimony, because the expert could not testify to a medical certainty or probability that McCarty was sterile at the time of conception. This is relevant, material evidence, SDCL 19–12–1, and is admissible. SDCL 19–12–2; *C.K.A. v. M.S.*, 695 P.2d 785 (Colo.Ct.App.1984) (defense expert allowed to testify defendant was "probably" sterile at time of conception). The objection to the testimony goes to the weight, not the admissibility. *See Nebraska ex rel. Klostermeier v. Klostermeier*, 161 Neb. 247, 72 N.W.2d 848 (1955).

The defendant of course denied the acts charged against him. In addition he adduced evidence of sterility on his part. His own testimony in this regard was supported by that of a specialist in the genitourinary field of medicine and surgery. The evidence of this witness supported the claim of sterility produced by surgery at the time of trial. However, he was not able to testify that the surgery was performed before the conception of this child born out of wedlock. *The question of sterility was one of fact and for the jury. Id.* at 850–51 (emphasis added).

The jury was entitled to hear this evidence and consider it in making its determination of paternity. *See Estate of Kessler v. Loers*, 76 S.D. 158, 74 N.W.2d 599 (1956) (mother's testimony that father was "without power to procreate" convinced trier of fact beyond a reasonable doubt that child was fathered by another man). That is what a jury is for.

*See State ex rel. Brenden v. Susanka*, 74 S.D. 124, 49 N.W.2d 297 (1951) (defense of physical impossibility presents a plain issue of fact for the jury).

Finally, the trial court erred by concluding "the only time relevant to the trial court in a paternity action is the time of conception." This obviously begs the question, but should not exclude or control relevant evidence. No one can seriously argue that this statement should mean that evidence of sterility *at all other times* is irrelevant and therefore inadmissible.

WUEST, Justice (dissenting).

Although the majority opinion correctly sets out the standards for admissible medical expert testimony, it is incorrectly applied in this case. If we are going to change the rule, we should clearly so state so we do not confuse the bench and bar.

In our prior holdings, we have stated that medical experts are qualified to " 'express their opinions based upon medical certainty or medical probability, but not upon possibility.' " *Thomas v. St. Mary's Roman Catholic Church*, 283 N.W.2d 254, 258 (S.D.1979) (quoting *Koenig v. Weber*, 174 N.W.2d 218, 224 (1970)). However, in *Thomas*, we also stated that the purpose of allowing such testimony is to "insure that facts exist as shown by a fair preponderance of the evidence[.]" *Thomas*, 283 N.W.2d at 258 (citations omitted). In the present case, there were no facts that McCarty's expert witness could provide that would show the existence of his sterility at the time of conception, to a medical certainty or probability. McCarty's expert could only testify to a *possibility*, something that our rule has not allowed prior to this decision.

I would also point out that the citation of *Zepp v. Hofmann*, 444 N.W.2d 28 (S.D.1989) as support for the majority opinion is inappropriate, as neither the issue nor the facts of *Zepp* parallel this case. In *Zepp*, a personal injury case, the plaintiff introduced deposition testimony of two doctors. *Zepp*, 444 N.W.2d at 30. Prior to the reading of the depositions at trial, the defendant objected to certain portions of the deposition testimony

of one of the doctors. *Id.* "The trial court refused to rule on the objection stating that it was waived by failing to object at the deposition." *Id.* at 32. Thus, the issue faced by this court on appeal was whether or not the objection was waived by the defendant's failure to object at the deposition. *Id.* at 33. We ruled that the objection was not waived since the objection could not have been obviated or removed at the deposition. *Id.* In *Zepp*, the doctor was asked to give "a medical opinion as to whether the [plaintiff's] injuries were consistent with what allegedly occurred on the day of the incident." *Id.* The defendant objected on the ground that the doctor was incompetent to reconstruct the accident. We disagreed, since the question asked only for medical opinion, not accident reconstruction. *Id.*

The holding announced in the majority opinion is an unwarranted change of our rule on allowing expert medical testimony. I would affirm the trial court.