Michael Anthony TAYLOR, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–89–707.

Court of Criminal Appeals of Oklahoma.

Jan. 31, 1995.

322

Eugenia T. Baumann, Asst. Public Defender, Oklahoma City, for defendant at trial.

Sandra Stensaas, Carl Alexandre, Asst. Dist. Attys., Oklahoma City, for state at trial.

Carolyn L. Merritt, Asst. Public Defender, Oklahoma City, for appellant on appeal.

Robert H. Henry, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge:

Michael Anthony Taylor was tried by a jury and convicted of First Degree Burglary in violation of 21 O.S.Supp.1982, § 1431 (Count I), First Degree Rape in violation of 21 O.S.Supp.1986, § 1114 (Count II), Forcible Oral Sodomy in violation of 21 O.S.1981, § 888 (Counts III and IV) and First Degree Robbery in violation of 21 O.S.1981, § 801 (Count V), all after former conviction of two or more felonies, in the District Court of Oklahoma County, Case No. CRF–88–3222. In accordance with the jury's recommendation, the Honorable Jack R. Parr sentenced Taylor to fifteen years imprisonment each on Counts I and V, and ninety-nine years imprisonment each on Counts II, III and IV. Judge Parr ordered the sentences to run consecutively.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 23, 1988, a man broke a window and entered S.H.'s home. A.H., S.H.'s mother, was asleep on the couch in the living room. S.H. saw the intruder and ran to the living room to call the police. The intruder grabbed the phone from S.H. and demanded money. She gave him $135.00. He subsequently forced both S.H. and A.H. to orally sodomize him. He also raped S.H.

S.H. helped police design a composite sketch of her assailant, who was black. On the basis of this drawing, police identified and apprehended Taylor. He voluntarily provided officials from the Oklahoma County Police Department with samples of his saliva, hair and blood. Police also prepared a standard rape kit with blood and semen samples

collected from S.H. and A.H. Oral washings and blood and semen samples from their clothing were also collected.

■ When conventional comparison testing of all these samples proved inconclusive, they were sent to Lifecodes Corporation[1] to be analyzed using a procedure called DNA[2] Print Identification.[3] Scientists at Lifecodes concluded that the DNA in Taylor's blood sample "matched" the DNA in the semen found on the victims' clothing.

■ At defense counsel's request, the trial court held an in camera hearing to determine whether DNA testing met the admissibility standard set forth in *Frye v. United States*.[4] The sole witness was State's expert Dr. Jay S. Hanous, faculty member of the Department of Biochemistry and Molecular Biology at the University of Oklahoma College of Medicine.[5] He described the DNA profiling procedure (restriction fragment length polymorphism or "RFLP" analysis) Lifecodes used to type Taylor's DNA and stated that most laboratories follow it. Hanous testified that he spoke with people from Lifecodes, reviewed its protocols[6] and concluded that the steps it follows when conducting its experiments are consistent with accepted practices in the field of genetics. When asked about the probability statistics Lifecodes used to illustrate the likelihood that Taylor's

DNA pattern could be found in another human being, Hanous testified that the scientific community accepted as reliable the procedure Lifecodes followed in making the calculation.

After hearing Hanous's testimony, the trial court ruled that DNA profiling generally and the particular procedures followed by Lifecodes in this case met the *Frye* standard. Over defense counsel's objection, the trial court allowed Hanous and two other Lifecodes scientists to testify before the jury. Dr. John Coleman performed the DNA test procedure on the samples taken from Taylor and the victims. He explained the procedure he followed, stating that the results showed a match between Taylor's DNA and the DNA extracted from the semen samples found on the victims' clothing.

Dr. Michael Baird[7] monitored the test Coleman performed and testified it was done correctly and in accordance with standard procedures. He also stated that Taylor's specimen matched the DNA taken from the victims "within a reasonable degree of scientific certainty...."[8] Baird testified that only one in 97 million African Americans possess the same genetic pattern identified in Taylor's DNA and matched with the DNA extracted from the specimens found on the

---

1. Lifecodes is a for-profit company based in New York.

2. DNA is the acronym for the scientific term Deoxyribonucleic acid.

3. "DNA Print Identification" is a trademark name possessed by Lifecodes. The same procedure is also commonly referred to as DNA "Fingerprinting," though some have criticized this term as creating the false impression that a match between two DNA samples is as conclusive as a match between two fingerprints. It is not. *See Commonwealth v. Curnin*, 409 Mass. 218, 565 N.E.2d 440, 441, n. 2 (1991).

4. 293 F. 1013, 1014 (D.C.Cir.1923) (holding that novel scientific evidence may be admitted through expert testimony only if it has gained general acceptance in the field to which it relates). Defense counsel described the *Frye* test as a three-pronged test requiring the State to establish 1) the validity of the underlying principles, 2) the validity of the techniques applying those principles, and 3) the proper application of

those techniques in the case at issue. We agree with *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483, 490 (1992), that the third prong is not part of the *Frye* analysis.

5. Defense counsel did not present any expert testimony either at the in camera hearing or during trial. She believed Taylor was not entitled to an expert in this instance. While she could have requested funds for an expert, she did not. Taylor claims in his second proposition that defense counsel's failure to request funding for a DNA expert constituted ineffective assistance.

6. Protocols are the steps technicians follow when performing certain experiments, from receipt of the specimen to the final result. They help ensure accuracy, reliability and consistency.

7. At the time of the hearing, Dr. Baird—a geneticist—worked at Lifecodes as Director of Forensics and Paternity.

8. Tr. 343.

victims.[9] While Baird conceded that errors are possible during laboratory testing in general, he testified that a mistake made during DNA testing is more likely to generate no result rather than an incorrect one.[10]

Taylor filed his initial appellate brief on August 24, 1990, claiming, among other things, that the results from the DNA profiling should not have been admitted against him. After concluding that the case presented a question of first impression in our jurisdiction,[11] this Court on February 18, 1992, remanded Taylor's case to the district court and ordered an evidentiary hearing to determine the following: whether DNA fingerprinting is generally accepted in the scientific community; whether the statistical conclusions derived from DNA fingerprinting are generally accepted in the scientific community; and, whether the procedures used in Taylor's case comported with generally accepted scientific procedures. We also ordered that State funds be used to hire experts to assist Taylor in presenting and defending his position.

The evidentiary hearing was conducted in two parts before the Honorable John M. Amick, District Judge. The first was on August 5, 6 and 10 of 1992; the second was on May 17, 1993. The State presented five expert witnesses; Taylor presented two. Judge Amick filed his Findings of Fact and Conclusions of Law on August 30, 1993. Based upon the evidentiary hearing testimony, Judge Amick found that the DNA evidence was properly admitted against Taylor. He concluded that DNA testing and related statistical conclusions are generally accepted in the scientific community. He also found that the scientific procedures conducted in this case were performed in accordance with generally accepted standards.

■ In a supplemental proposition filed after the evidentiary hearing,[12] Taylor claims the Findings of Fact and Conclusions of Law are clearly erroneous and should not be used to uphold the trial judge's admission of the DNA evidence against him. Taylor argues that the DNA match evidence and accompanying statistics were obtained through procedures which have not gained general acceptance in the scientific community and should therefore have been excluded under *Frye*. As a second basis for exclusion, he claims that Lifecodes failed to properly perform the procedures in question.[13] In its brief response, the State maintains that DNA profiling has gained general acceptance among

9. Several weeks before trial, Lifecodes established yet another point of comparison between Taylor's DNA specimen and the crime scene sample. Dr. Baird testified that given this additional point of comparison, the probability that another individual would possess the DNA characteristics found to exist in Taylor and the test sample would be 1 in 97 billion. Tr. 348.

10. *See also People v. Mohit*, 153 Misc.2d 22, 579 N.Y.S.2d 990, 995 (Westchester County Ct.1992) (holding that "[c]linical errors [committed during DNA profiling] are far more likely to cause an inconclusive or no match result than a false positive.").

11. While this Court has not previously addressed the admissibility of DNA evidence, we have mentioned this type of evidence in several contexts. *See Sadler v. State*, 846 P.2d 377, 381–83 (Okl.Cr. 1993) (finding no *Brady* violation where State withheld from defendant inconclusive DNA report). *See also Fritz v. State*, 811 P.2d 1353, 1366 (Okl.Cr.1991) (concluding that appellant's right to speedy trial was not violated even though lapse of time between offense and filing of charge could have caused hair sample to deteriorate and thus precluded DNA testing). We also note that our state legislature has enacted statutes addressing some DNA issues. *See* 22 O.S.1991, § 751.1 ("DNA profile—Use as evidence—Notification of defendant"); 22 O.S.Supp.1994, § 991a, to be effective July 1, 1996 ("Sentence—Powers of court—County community service sentencing programs—DNA testing for identification purposes"); 74 O.S.Supp.1994, § 150.27 ("Deoxyribonucleic acid (DNA) laboratory—Coordination of use with law enforcement agencies"); 74 O.S.Supp.1994, § 150.27a, to be effective July 1, 1996 ("OSBI DNA Offender Database"); and, 74 O.S.1991, § 150.28 ("Deoxyribonucleic acid (DNA) laboratory—Acquisition or transmittal of specimens and information—Procedures").

12. Taylor's first proposition in his appellate brief, which questioned the admissibility of DNA evidence, prompted this Court to order the evidentiary hearing ultimately conducted. His supplemental proposition attacks the evidentiary hearing judge's conclusion that DNA evidence in general and the DNA evidence specifically admitted against him pass muster under *Frye*.

13. In strict *Frye* states such as Oklahoma, the admissibility of novel scientific evidence is not conditioned upon a preliminary showing that no appreciable error occurred in the particular testing procedure at issue. Rather, allegations of error in the testing process affect the weight of the novel scientific evidence but not its admissi-

scientists and appellate courts, and that any doubts about the manner in which the tests at issue were performed affected only the weight of the evidence and were thus properly left to the factfinder. We affirm the evidentiary hearing judge's determination that the DNA match evidence and accompanying statistics were properly admitted against Taylor.

## II. OVERVIEW OF DNA PROFILING

DNA is the "fundamental natural material which determines the genetic characteristics

of all life forms." [14] Most of the DNA structure in one human being is identical to the DNA structure of another.[15] With the exception of identical twins, however, a small percentage of an individual's DNA structure is different from that of another individual.[16] These differing DNA sites "apparently do not encode any observable human characteristics" and thus are often referred to as "junk" DNA.[17]

Even some of these unique patterns or "polymorphisms" within one· individual may be similar to those in another, so that "the

bility. See e.g., People v. Mehlberg, 249 Ill.App.3d 499, 188 Ill.Dec. 598, 625, 618 N.E.2d 1168, 1195 (5 Dist.1993) (concluding that whether laboratory properly performed accepted techniques goes to weight, not admissibility, and is thus not included in the Frye calculation); State v. Harris, 866 S.W.2d 583, 587 (Tenn.Cr.App.1992) (concluding that to be admissible under Frye, evidence must have gained general acceptance in relevant scientific field); State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502, 507 (1993) (concluding that conditioning admissibility on showing of no human error is "inappropriate in jurisdictions utilizing the Frye standard of admissibility [because t]he core concern of Frye is only whether the evidence being offered is based on established scientific methodology.").

We recognize that some Frye jurisdictions have bolstered the traditional "general acceptance" test by adding a requirement that novel scientific evidence be excluded if the trial court determines that the testing procedures at issue were not properly performed. For example, in People v. Castro, 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct.1989), a New York court ruled that novel scientific evidence may be admitted if it has gained general acceptance in the relevant scientific community, if the particular techniques generating such evidence have gained general acceptance in the relevant scientific community, and if the testing laboratory in the particular case properly performed the accepted scientific procedures in reaching the results. Other courts have also applied this "Frye plus" standard. See State v. Houser, 241 Neb. 525, 490 N.W.2d 168, 181 (1992) (applying three pronged test to determine whether novel scientific evidence should be admitted: 1) whether underlying theory generally accepted, 2) whether particular techniques at issue generally accepted, and 3) whether techniques were properly performed by testing lab); Perry v. State, 606 So.2d 224, 225 (Ala.Cr.App. 1992) (same); Hopkins v. State, 579 N.E.2d 1297, 1302–03 (Ind.1991) (same). Cf. Smith v. Deppish, 248 Kan. 217, 807 P.2d 144, 159 (1991) (concluding that while Frye is met if evidence and technique are both generally accepted, evidence may nonetheless be excluded on other bases such as irrelevancy, test samples prejudice,

or contamination); State v. Ford, 301 S.C. 485, 392 S.E.2d 781, 784 (1990) (same).

However, after reviewing the few Oklahoma cases where Frye has been specifically and explicitly applied, it is clear that this Court has not broadened the scope of the traditional general acceptance test. See Yell v. State, 856 P.2d 996 (Okl.Cr.1993) (concluding that novel scientific evidence must be generally accepted in scientific community); Davenport v. State, 806 P.2d 655, 658 (Okl.Cr.1991) (concluding that child accommodation syndrome must be generally accepted as reliable in medical community); Moore v. State, 788 P.2d 387, 398 (Okl.Cr.1990), cert. denied, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990) (concluding that hair comparison evidence had gained general acceptance in scientific community as precondition of admission); Driskell v. State, 659 P.2d 343, 356 (Okl.Cr.1983) (concluding that fiber comparison evidence was sufficiently established to have gained general acceptance in the relevant scientific community); Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495 (1951), cert. denied, 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951) (case in which this Court adopted the Frye standard). But see Kennedy v. State, 640 P.2d 971, 977 (Okl.Cr.1982) (applying three-pronged standard set forth in People v. Kelly, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976). Accordingly, we find that the admissibility of the DNA evidence presented against Taylor was not conditioned upon Lifecodes's proper performance of the test procedures. Any issue involving error in the analysis was properly presented to and determined by the jury.

14. R. Michael Sweeney, DNA Typing: Defending a Process under Vigorous Attack, 21 Capital Univ. L.Rev. 611, 614 (1992) [hereinafter Sweeney, Defending a Process].

15. D.H. Kaye, The Admissibility of DNA Testing, 13 Cardozo L.Rev. 353, 354 (1991).

16. Id. See also Sweeney, Defending a Process at 616, n. 40.

17. Kenneth R. Kreiling, DNA Technology in Forensic Science, 33 Jurimetrics 449 (Summer 1993) [hereinafter Kreiling, DNA Technology].

probability that two individuals in a given population will share similar polymorphic sequences ranges from less tha[n] one percent to over thirty percent."[18] Thus, in an effort to obtain through the DNA matching process the most individualized picture possible of one person's genetic structure, scientists have determined that more than one polymorphic sequence per individual specimen must be analyzed.[19] The astounding odds against two individuals sharing an equal number of the same DNA sequence at several of these highly polymorphic sites makes DNA profiling an effective forensic tool[20] in criminal cases.[21]

One state court has provided a highly simplified and thus helpful categorization of the overall DNA testing process.[22] First, the laboratory creates a DNA "print" or profile.[23] Second, a qualified person determines wheth-er the profiles of two samples match.[24] If the samples match, a population genetics formula is then used to determine the probability that a randomly selected individual would have possessed the same DNA sequences at common polymorphic sites.

## III. STANDARD OF ADMISSIBILITY

The admission of expert testimony is governed generally by 12 O.S.1981, § 2702, which provides that

[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise.

**18.** Sweeney, *Defending a Process* at 616.

**19.** *Id. See also* David T. Wasserman, *The Morality of Statistical Proof and the Risk of Mistaken Liability,* 13 Cardozo L.Rev. 935, 972 (1991) (concluding that "as the number and variability of the polymorphisms utilized in the typing procedure increases, the odds of two people having the same profile become vanishingly small."). For a detailed description of DNA molecules and an explanation of how differences in people's DNA structure can be used to identify them, *see People v. Watson,* 257 Ill.App.3d 915, 196 Ill.Dec. 89, 92–94, 629 N.E.2d 634, 637–39 (1994).

**20.** According to Dr. Ronald Acton, one of two defense experts who testified at the evidentiary hearing in this case, DNA profiling has been used as a forensic tool since the mid 1980's. *See also* Kreiling, *DNA Technology* at 456–57.

**21.** If an entire DNA strand could be analyzed and compared to another, it would be immediately apparent whether the two had come from the same individual. However, the DNA strand is so long that it is impossible under current technology to analyze and decode it from beginning to end. To determine whether two DNA strands came from a single donor, therefore, scientists must find and examine the smaller, highly polymorphic regions on each. If several of these extremely variable areas on each tested DNA specimen match, there is a high probability that both specimens came from one person.

**22.** *See State v. Bible,* 175 Ariz. 549, 858 P.2d 1152, 1180 (1993). For a more detailed discussion of the seven steps followed in the RFLP analysis, *see Cauthron,* 846 P.2d at 508–10; *Polk v. State,* 612 So.2d 381, 388–93 (Miss.1992). *See* *also Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436 (1990); *Curnin,* 565 N.E.2d at 445–48; *Vandebogart,* 616 A.2d at 486–88; *Castro,* 545 N.Y.S.2d at 990–92. *See also* Kreiling, *DNA Technology, supra;* Daniel C. Burke & Brian J. Whiteman, *Argue With Science? The Admissibility Debate Surrounding DNA Identification,* 7 Journal of Legal Commentary 597, 600–60 (1992); William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va.L.Rev. 45, 64–76 (1989) [hereinafter Thompson & Ford, *DNA Typing*].

**23.** This is accomplished by using "probes," which "lock onto polymorphic DNA segments that occur only once on the human DNA chain." Sweeney, *Defending a Process* at 621. When Lifecodes tested Taylor's DNA, it used organically cloned probes. It now uses synthetic probes which reduce the incidence of biological contamination associated with organic probes that can cause flawed test results. However, Dr. Baird, the Lifecodes geneticist who supervised Taylor's test, testified during the evidentiary hearing there was specific evidence that Taylor's test had not been contaminated.

**24.** During the evidentiary hearing, Dr. Baird from Lifecodes testified that at the time Taylor's DNA was analyzed, the scientists there used visual criteria to determine whether two tested samples "matched." Obviously, the scientists who performed this visual evaluation concluded that Taylor's specimen matched the sample found on the victim and the victim's clothing. In 1989, Lifecodes began utilizing both visual and numerical criteria to determine whether two samples match. Baird testified that he subjected Taylor's test results to the numerical test and concluded

Section 2702 sets forth the guidelines for determining whether a particular witness is qualified to testify as an expert, or whether the subject about which the expert will testify would actually assist the trier of fact in reaching its conclusion.[25] Oklahoma currently imposes an additional admissibility requirement upon expert testimony concerning "novel" scientific evidence, such as DNA profiling evidence. This type of evidence may be admitted only if the uncommon procedure or theory about which the expert plans to testify is "sufficiently established to have gained general acceptance in the particular field in which it belongs."[26] This Court has referred to the *Frye* "general acceptance" test as the foundational requirement for novel scientific evidence.[27] Shortly after the evidentiary hearing in this case, the United States Supreme Court held in *Daubert v.*

---

that the samples matched under these criteria. First Evid.Hrg.Tr. II, p. 116.

**25.** *See Hooks v. State*, 862 P.2d 1273, 1278–79 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1993) (limiting admission of expert testimony when offered only to show that defendant did not possess intent to commit crime); *Woodruff v. State*, 846 P.2d 1124, 1136 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993) (concluding trial court properly admitted expert testimony describing how rope tied as garrotte could be used as a weapon); *Bechtel v. State*, 840 P.2d 1, 8 (Okl.Cr.1992) (concluding that expert was qualified to testify about battered woman syndrome); *Moore*, 788 P.2d at 398 (concluding that expert testimony that hair comparison results meant defendant was in victim's house was properly admitted under section 2702); *Fowler v. State*, 779 P.2d 580, 584 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990) (concluding that police officer's demonstration of how gun used in robbery would have been held and fired was properly admitted under section 2702); *Berry v. State*, 753 P.2d 926, 929 (Okl.Cr.1988) (concluding that police officer's testimony on severity of victim's injuries was properly admitted under section 2702); *Coslow v. State*, 748 P.2d 999, 1000–01 (Okl.Cr.1988) (concluding that drug rehab director's testimony was properly denied under section 2702); *Marr v. State*, 741 P.2d 884, 886 (Okl.Cr.1987) (concluding that policeman's testimony about effects of alcohol on car wreck was properly admitted under section 2702); *Smith v. State*, 737 P.2d 1206, 1212 (Okl.Cr.1987), *cert. denied*, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987) (concluding that medical examiner was qualified under section 2702 to give opinion about origin of hair); *Roubideaux v. State*, 707 P.2d 35, 39 (Okl. Cr.1985) (concluding that expert witness's testimony concerning whether witness's memory of events was reliable properly admitted under section 2702); *Smith v. State*, 656 P.2d 277, 280–81 (Okl.Cr.1982) (concluding that expert witness's testimony was properly excluded under section 2702).

**26.** *Yell*, 856 P.2d at 996 (quoting *Frye*, 293 F. at 1014). *See also Davenport*, 806 P.2d at 660 (Parks, J., Dissenting). Unlike Oklahoma, many *Frye* jurisdictions have either developed the traditional "general acceptance" standard beyond its literal meaning, or combined the *Frye* analysis with other admissibility criteria. For example, the New York Court of Appeals has held that the *Frye* test "is not whether a particular procedure is unanimously endorsed by the scientific community, but whether it is generally acceptable as reliable." *Castro*, 545 N.Y.S.2d at 986–87. *See also Bible*, 858 P.2d at 1183 (holding that scientific evidence which passes muster under *Frye* is admissible "subject to a foundational showing."); *Nelson v. State*, 628 A.2d 69 (Del.1993) (applying a combination of *Frye* and rules of evidence); *Houser*, 490 N.W.2d at 178 (concluding *Frye* test is only first of several criteria that must be satisfied before novel scientific evidence may be admitted); *Cauthron*, 846 P.2d at 505 (holding that "[i]f there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted."); *United States v. Porter*, 618 A.2d 629, 634 (D.C.App.1992) (concluding that the *Frye* test "begins—and ends—with . . . whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology."); *State v. Montalbo*, 73 Haw. 130, 828 P.2d 1274, 1280 (1992) (concluding that court should weigh general acceptance of scientific theory along with five other factors to determine whether such evidence should be admitted); *People v. Axell*, 235 Cal. App.3d 836, 1 Cal.Rptr.2d 411, 421 (1991) (holding that "[u]nder the *Kelly/Frye* rule, the proponent must establish [as a condition of admissibility] the reliability of the method, usually by expert testimony, that the witness furnishing the testimony is properly qualified as an expert to give an opinion on the subject, and that correct scientific procedures were used in the particular case."); *People v. Adams*, 195 Mich.App. 267, 489 N.W.2d 192, 197 (1992), *modified on other grounds* 441 Mich. 916, 497 N.W.2d 182 (1993) (concluding that scientific tests need not be infallible, but that reasonable certainty follow from them); *State v. Schwartz*, 447 N.W.2d 422, 424 (Minn.1989) (rephrasing the *Frye* standard to require that experts in the field generally agree that the evidence is reliable and trustworthy); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847, 852–53 (1990) (emphasizing nonexclusive adherence to *Frye* formula).

**27.** *See Davenport*, 806 P.2d at 661. *See also Yell*, 856 P.2d at 996.

**328**

*Merrell Dow Pharmaceuticals*[28] that *Frye* has been superseded by the Federal Rules of Evidence and most specifically by Rule 702.[29] The Court concluded that the rigid "general acceptance" test set forth in *Frye* is "at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'"[30] Despite both the federal courts'

shift in position and general criticism of *Frye*,[31] many state courts have continued to adhere to it.[32]

■ We on the other hand believe the time is right for this Court to abandon the *Frye* test and adopt the more structured and yet flexible admissibility standard set forth in *Daubert*.[33] A review of our pertinent case-

---

**28.** —— U.S. ——, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993).

**29.** We have previously considered federal opinions in interpreting our State Evidence Code provisions. *See Beck v. State,* 824 P.2d 385, 389 (Okl.Cr.1991) (concluding that in the absence of state cases interpreting a particular section of the Evidence Code, this Court will look to United States Supreme Court's construction of counterpart section in Federal Rules of Evidence).

**30.** *Daubert,* —— U.S. at ——, 113 S.Ct. at 2794 (citations omitted).

**31.** The Arizona Supreme Court in *Bible,* 858 P.2d at 1181, set forth some of the *Frye* test's significant shortcomings:

New discoveries are not immediately accepted in the scientific community. Rigid application of the general acceptance test would forbid judicial use of a new discovery even though there may be direct experimental or clinical support for the principle. Furthermore, history shows that generally accepted scientific theory is not always correct.

In a concurring opinion in *Hopkins,* 579 N.E.2d at 1306, one judge stated that in recent years "courts in at least thirty jurisdictions have limited, avoided, or rejected the *Frye* requirement." *See also Montalbo,* 828 P.2d at 1279–80 (recognizing that *Frye* has been subject to scathing attacks for "causing unacceptable delays in the admissibility of reliable evidence due to the lag between the development of new techniques and their acceptance in the scientific community . . ., [for being] ambiguous and difficult to apply . . ., [and for] obscuring the critical question of the relevance of scientific evidence to the issues in dispute."); 1 John W. Strong, et al., *McCormick on Evidence* § 203 at 873–76 (4th ed. 1992) (concluding that *Frye*'s objectives can be attained with fewer limitations on the admissibility of scientific evidence, the commentator writes that "[a]ny relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion . . . [such as] prejudicing or misleading the jury or consuming undue amounts of time."). *See also Andrews v. State,* 533 So.2d 841, 846 (Fla.App. 5 Dist. 1988) (holding that an admission standard based upon relevancy is preferable to the *Frye* general acceptance approach "which is predicated on a 'nose counting.'"); *Caldwell,* 393 S.E.2d at 441 (concluding that "the trial court makes [the admissibility] determination based on the evidence

available to him rather than by simply calculating the consensus in the scientific community.").

**32.** As of the date of this writing, seventeen reported state court opinions have considered *Daubert.* In only two of these opinions did the highest state court abandon *Frye* in favor of *Daubert. See State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993); *Department of Social Services v. McCarty,* 506 N.W.2d 144 (S.D.1993). Three courts adopted the *Daubert* federal rules of evidence approach, but emphasized that they had never relied exclusively upon *Frye. See Nelson,* 628 A.2d 69; *Springfield v. State,* 860 P.2d 435 (Wyo. 1993); *State v. Futch,* 123 Or.App. 176, 860 P.2d 264 (1993). Five of the opinions were rendered by appellate courts which left to their respective supreme courts the decision whether to abandon *Frye* and adopt *Daubert. See State v. Bauer,* 512 N.W.2d 112 (Minn.App.1994), *affirmed* 516 N.W.2d 174 (1994); *Watson,* 629 N.E.2d 634; *State v. Davis,* 860 S.W.2d 369 (Mo.App.E.D. 1993); *Mehlberg,* 188 Ill.Dec. 598, 618 N.E.2d 1168; *State v. Alt,* 504 N.W.2d 38 (Minn.App. 1993). The Pennsylvania Supreme Court held that *Daubert* did not require state court abolition of *Frye,* and left the issue to another day. *See Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395, 400 n. 2 (1994). The Arizona Supreme Court took a similar approach, concluding that it would adhere to *Frye* and its shortcomings and leave to another day the decision whether to adopt *Daubert. See Bible,* 858 P.2d at 1183. The highest courts in two states specifically rejected the *Daubert* federal rules of evidence approach and maintained their loyalty to *Frye. See People v. Wesley,* 83 N.Y.2d 417, 633 N.E.2d 451, 611 N.Y.S.2d 97 (1994); *Fishback v. People,* 851 P.2d 884 (Colo.1993). The New Hampshire Supreme Court refused to decide whether *Daubert* and the federal rules of evidence superseded *Frye. See State v. Cressy,* 137 N.H. 402, 628 A.2d 696 (1993). Two New York courts did not squarely address the issue. *See People v. Moore,* 194 A.D.2d 32, 604 N.Y.S.2d 976 (N.Y.A.D.1993); *People v. Santana,* 159 Misc.2d 301, 604 N.Y.S.2d 1016 (N.Y.Sup.1993).

**33.** We are mindful that other appellate courts faced with this decision have reached the opposite conclusion. *See Bible,* 858 P.2d at 1183 ("[N]otwithstanding legitimate criticism of *Frye,* . . . this is not the case to determine whether Arizona should follow *Daubert." See also Fish-*

law reveals that this Court has not consistently relied upon *Frye* when faced with questions involving the admissibility of expert testimony describing novel scientific evidence. In fact, since adopting *Frye* in 1951, we have specifically cited to it in only six reported cases.[34] While a number of our cases have mentioned the "general acceptance" standard, several others appear to have utilized section 2702 in analyzing the admission of expert testimony describing novel scientific evidence.[35] In those cases in which we have specifically applied the *Frye* analysis, we have also generally failed to consider the possible prejudicial effect of the expert testimony at issue.[36]

The *Daubert* reliability approach provides a uniform method of addressing the admissibility of expert testimony on all types of scientific evidence. Our adoption of the *Daubert* approach will provide structure and guidance to what has until now been a potentially confusing and sparsely defined area of legal analysis in our state jurisprudence.[37] Adherence to *Daubert* will also ensure that relevant sections of the Evidence Code are properly considered in the admission decision. Finally, we agree with the Second Circuit Court of Appeals that "[i]n testing for the admissibility of a particular type of scientific evidence, whatever the scientific 'voting' pattern may be, the courts cannot in any event surrender to scientists the responsibility for determining the reliability of that evidence."[38] We now turn to a discussion of the *Daubert* test.[39]

◼ Though the test we adopt today is more flexible than the *Frye* general acceptance standard, *Daubert* makes clear that trial judges must continue to act as gatekeepers, ensuring that all novel scientific evidence is both reliable and relevant.[40] To be considered reliable, the qualified expert's testimony must be about "scientific knowledge." Stated another way, the expert's "inference[s] or assertion[s] must be grounded in the methods and procedures of science[,] ... derived by the scientific method ... [and] supported by appropriate validation...."[41] In short, the reasoning or methodology un-

---

back, 851 P.2d at 890 (DNA testing "is precisely the sort of scientific evidence which requires application of the *Frye* test.").

**34.** *See Paxton v. State,* 867 P.2d 1309, 1323, n. 3 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); *Yell,* 856 P.2d at 996; *Davenport,* 806 P.2d at 661; *Moore,* 788 P.2d at 398; *Driskell,* 659 P.2d at 356; *Henderson,* 230 P.2d at 502.

**35.** *See e.g. Fox v. State,* 779 P.2d 562, 571 (Okl. Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990) (finding that expert testimony describing results of luminal testing met section 2702 requirements; *Frye* not cited even though Court found it had never approved luminal testing); *Kennedy,* 640 P.2d at 977 (after mentioning section 2702 and the *Frye*-plus standard followed by California courts, this Court found that a proper foundation had been laid and that bitemark evidence was thus properly admitted).

**36.** *See* 12 O.S.1991, § 2403.

**37.** We recognize that in adopting *Daubert* and applying it to the facts of this case, we will be reviewing the DNA evidence presented against Taylor under a different admissibility standard than was in existence at the time of his trial and subsequent evidentiary hearing. After reviewing the evidence in this case, however, we are confi-

dent that it passed muster under *Frye*. Therefore, our conclusion that the DNA evidence was properly admitted against Taylor is not dependent upon our adoption and application of *Daubert*.

**38.** *United States v. Williams,* 583 F.2d 1194, 1198 (2d.Cir.1978). *See also Porter,* 618 A.2d at 634 (concluding that because *Frye* "general acceptance" test focuses "on counting scientists' votes, rather than [on] verifying the soundness of a scientific conclusion ..., the very existence of [a] dispute precludes admission of the testimony."); *People v. Shirley,* 31 Cal.3d 18, 56, 181 Cal.Rptr. 243, 266, 723 P.2d 1354, 1377 (1982) (en banc) (holding that under the strict "general acceptance" approach, novel scientific evidence should not be admitted if "scientists significant either in number or expertise publicly oppose [such evidence]...."); *Cauthron,* 846 P.2d at 514 (concluding that the decision whether novel scientific evidence meets *Frye* standards "rests on the existence of a controversy, not on its resolution.").

**39.** Defense counsel maintains that the difference between the *Frye* and *Daubert* standards is merely a "linguistic" one. We disagree.

**40.** *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795.

**41.** *Id.*

derlying the testimony must be "scientifically valid." [42]

■ *Daubert* identifies several factors which may aid trial judges in determining whether proposed section 2702 evidence is scientifically valid and thus reliable. First, it might be important to know whether the scientific method at issue has been or can be tested. The "falsifiability, ... refutability, or testability" of a proffered theory could help determine its scientific status.[43] A trial court might also consider whether the theory or technique has been subjected to peer review and publication. Some novel theories or techniques may be too new or of too limited an interest to have been published. Yet, if a particular new technique has been scrutinized by the scientific community, it is more likely that major flaws will have been detected. Again, the fact of publication or no publication is relevant to the section 702 reliability inquiry, but not dispositive of it.

■ Thirdly, a trial court should ordinarily consider the proffered technique's known or potential rate of error. Fourth and finally, the *Daubert* Court recognized that whether the new theory has gained general acceptance in the relevant scientific community is a pertinent though clearly not a required consideration in making the reliability determination. Prevailing acceptance can suggest that a particular theory is sufficiently reliable to warrant admission, while minimal support from the scientific community can suggest that the evidence at issue is unreliable and should be excluded.

The second prong of the section 702 admissibility test requires that the expert's testimony "assist the trier of fact to understand the evidence or to determine a fact in issue,...." This requirement ensures that the subject of an expert's testimony will be relevant to the issues in the case. An expert's scientific testimony is relevant if it "fits," that is, if it bears a "valid scientific connection to the pertinent inquiry...." [44]

■ In addition to outlining and defining the section 702 requirements, the Court in *Daubert* set forth some principles to guide all admissibility determinations. Recognizing the permissive tenor of the Federal Rules of Evidence, the Court emphasized the flexibility of this section 702 admissibility inquiry: "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." [45] The Court also cautioned that the focus of the section 702 inquiry "must be solely on principles and methodology, not on the conclusions that they generate." [46]

---

42. *Id.* at ——, 113 S.Ct. at 2796.

43. *Id.* at ——, 113 S.Ct. at 2797 (quoting K. Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th ed. 1989).

44. *Id.* at ——, 113 S.Ct. at 2796.

45. *Id.*

46. *Id.* In *U.S. v. Martinez*, 3 F.3d 1191, 1197 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994), the Eighth Circuit Court of Appeals concluded that taking judicial notice per *Daubert* of the reliability and relevance of expert testimony on DNA profiling evidence did not render it automatically admissible. The Court found that the *Daubert* reliability requirement mandated in each case a "preliminary showing that the expert properly performed a reliable methodology in arriving at his opinion." *Martinez*, 3 F.3d at 1197 (emphasis added). Mindful of *Daubert's* admonition to focus the admissibility inquiry on principles and methodology rather than on the conclusions they generate, the *Martinez* Court finally concluded that "[a]n alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself." *Id.* at 1198 (emphasis added). We reject the Eighth Circuit's interpretation of *Daubert* and hold that allegations of error in the testing process affect the weight of scientific or technical evidence but not its admissibility. *Compare U.S. v. Davis*, 40 F.3d 1069, 1074–75 (10th Cir.1994) (declining to address apparent circuit split (*see Jakobetz, infra*) on this issue).

We recognize some courts have held that "admissibility of specific [DNA] test results in a particular case hinges on the laboratory's compliance with appropriate standards and controls,...." *Schwartz*, 447 N.W.2d at 428. *See also Polk*, 612 So.2d at 390, n. 2 (concluding that whether particular test was performed properly goes to admissibility or competency rather than weight or credibility); *Adams*, 489 N.W.2d at 197 (concluding that trial court can not admit test results until prosecutor establishes in each particular case that generally accepted laboratory procedures were followed); *Smith v. Deppish*, 807 P.2d at 159 (concluding that results of RFLP testing may be inadmissible on grounds of relevancy or prejudice, or because of sample contamination or chain of custody questions); *Cur-*

## IV. STANDARD OF REVIEW

We have consistently reviewed trial courts' decisions regarding the admissibility of expert testimony under an abuse of discretion standard.[47] In cases involving the admissibility of expert testimony on novel scientific evidence, however, we have applied two standards of review. On the one hand, we have reviewed trial judges' decisions admitting or excluding novel scientific evidence under an abuse of discretion standard.[48] On the other hand, this Court has conducted extensive, independent review of novel scientific evidentiary material in determining whether the trial judges' decisions admitting or excluding it was proper.[49]

---

nin, 565 N.E.2d at 442–43, n. 7 (concluding that any question as to proper implementation of accepted testing procedures should be resolved by court as threshold question before presenting evidence to jury); *Caldwell*, 393 S.E.2d at 441.

However, other courts which have considered the issue in this and other contexts have concluded that whether a given test was properly performed affects only the weight and not the admissibility of the evidence and is thus a question for the trier of fact. *See U.S. v. Jakobetz*, 955 F.2d 786, 797 (2nd Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (concluding that rather than make initial determination that evidence is true, courts should submit otherwise admissible evidence to jury and let it "discharge its duties of weighing the evidence, making credibility determinations, and ultimately deciding the facts."); *State v. Kalakosky*, 121 Wash.2d 525, 852 P.2d 1064, 1072 (1993) (concluding that "[t]he issue of human error in the forensic laboratory is analyzed under ER 702 and is not a part of the *Frye* test which asks if the theory underlying the science and the RFLP test are generally accepted in the relevant scientific community."); *Cauthron*, 846 P.2d at 512 (concluding that once trial court determines procedure passes *Frye* test, questions about whether procedure was properly carried out is for jury); *Vandebogart*, 616 A.2d at 489–90; *Mehlberg*, 188 Ill.Dec. at 625, 618 N.E.2d at 1195 (concluding that "any question concerning the specific procedures used by the company or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give this evidence; however, if the procedures used are shown to give an unreliable result, the court may find it necessary to exclude the evidence entirely."); *State v. Bauer*, 512 N.W.2d 112, 115 (Minn.App.1994), *affirmed* 516 N.W.2d 174 (1994); *State v. Davis*, 860 S.W.2d 369 (Miss. 1993); *Porter*, 618 A.2d at 636 (concluding that "[a]ny failure by the scientists to adhere to the appropriate procedure is, of course, a proper subject of inquiry, but does not raise an issue which implicates *Frye*."); *Watson*, 196 Ill.Dec. at 99, 629 N.E.2d at 644 (concluding that whether scientifically acceptable test was properly performed is jury question); *People v. Thomas*, 137 Ill.2d 500, 148 Ill.Dec. 751, 561 N.E.2d 57 (1991), *cert. denied*, 498 U.S. 1127, 111 S.Ct. 1092, 112 L.Ed.2d 1196 (1991); *Pennington*, 393 S.E.2d at 854; *Ford*, 392 S.E.2d at 784; *Martinez v. State*, 549 So.2d 694, 695–96 (Fla.Dist.Ct. App.1989); *Cobey v. State*, 80 Md.App. 31, 559

A.2d 391, 398 (1989), *cert. denied*, 317 Md. 542, 565 A.2d 670 (1989).

This Court has never specifically held that the admissibility of novel scientific procedural conclusions is conditioned upon the procedure having been flawlessly performed. In fact, prior cases addressing the admissibility of scientific evidence indicate that whether the particular testing procedures utilized were properly performed goes to the weight of the evidence produced and not its admissibility. *See Williamson v. State*, 812 P.2d 384, 405 (Okl.Cr.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992) (concluding that questions regarding expert's conclusions are for jury); *Moore*, 788 P.2d at 398 (concluding that whether expert properly performed hair comparison test goes to weight of evidence and is thus a jury question); *But see Plunkett v. State*, 719 P.2d 834, 840 (Okl.Cr.1986), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986) (while Court held test at issue must be "dependable" to be admissible, a close reading of the case reveals that this dependability requirement concerned the general acceptance prong of *Frye* and was not intended to force the proponent of novel scientific evidence to prove as a precondition to admissibility that the test at issue was performed properly). We will continue under *Daubert* to adhere to the position we maintained under *Frye*: issues over proper performance of testing procedures used to generate scientific or technical evidence affect only the weight of that evidence and not its admissibility.

47. *See Clayton v. State*, 840 P.2d 18, 28 (Okl.Cr. 1992), *cert. denied*, — U.S. —, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1992); *Moore*, 788 P.2d at 397; *Phillips v. State*, 756 P.2d 604, 610 (Okl.Cr.1988).

48. *See Fox*, 779 P.2d at 571 (citing the *Frye* test but not citing the *Frye* case, Court reviewed trial court's decision on admissibility of novel scientific evidence under abuse of discretion standard). *See also Plunkett*, 719 P.2d at 840; *Driskell*, 659 P.2d at 356; *Kennedy*, 640 P.2d at 978; *Fowler v. State*, 512 P.2d 238, 244 (Okl.Cr.1973).

49. *See Bechtel*, 840 P.2d at 7 (Court independently reviewed available sources on the novel "battered woman syndrome" before concluding that trial judge's decision not to admit this evidence was improper); *Davenport*, 806 P.2d at 658 (concluding that "[t]his Court has the right to make an independent search of appropriate medical

 After reviewing our inconsistent caselaw and considering the permanent impact of a trial judge's decision to admit novel scientific evidence, we find we should subject that decision to an independent, thorough review and not simply ask whether an abuse of discretion was committed.[50] We thus adopt the reasoning of the District of Columbia Court of Appeals and conclude that our review of a trial judge's decision admitting or excluding novel scientific evidence should be an independent one not limited by deference to the trial judge's discretion:

> Generally, the decision whether or not to admit expert testimony is addressed to the sound discretion of the trial court. Where the question of the general acceptance of a new scientific technique is raised, however, the proponent will often be asking the court to establish the law of the jurisdiction for future cases.... Accordingly, in

recognition of the fact that the formulation of the law of this jurisdiction is a quintessentially appellate function, we engage in a broad review of the trial judge's determination whether the forensic use of DNA technology has gained general acceptance. In doing so, we may consider not only expert evidence of record, but also judicial opinions in other jurisdictions, as well as pertinent legal and scientific commentaries.[51]

## A. EXPERT TESTIMONY ON DNA MATCH EVIDENCE

 After independently reviewing the evidentiary hearing transcripts in this case,[52] the evidentiary hearing judge's findings and conclusions, numerous articles discussing scientists' views on the merits of DNA profiling,[53] and a number of state[54] and

---

and legal doctrines to determine if the [child accommodation] syndrome is generally accepted and meets the proper test.").

50. A number of jurisdictions conduct an independent review of trial court's decisions admitting or excluding novel scientific evidence. *See Cauthron*, 846 P.2d at 505; *Bible*, 858 P.2d at 1181; *Vandebogart*, 616 A.2d at 491 (rejecting abuse of discretion standard and adopting an independent and thorough standard of review for a trial judge's *Frye* decision); *Jones v. United States*, 548 A.2d 35, 40 (D.C.App.1988) (concluding that "in evaluating whether a scientific technique has gained general acceptance, appellate courts review the trial court's analysis de novo."); *Futch*, 860 P.2d at 269 ("Notwithstanding the usual deference to trial court discretion, we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code.") (citation omitted). *But see United States v. Bonds*, 12 F.3d 540, 553 (6th Cir.1993) (holding that function of appellate court is to assess district court findings, not to conduct an independent review that takes into account evidence which supported admissibility ruling as well as newly developed evidence not available to the trial court); *Mehlberg*, 188 Ill.Dec. at 621, 618 N.E.2d at 1191 (holding that appellate review of trial court's decision admitting or excluding expert testimony on novel scientific subject is for abuse of discretion); *Montalbo*, 828 P.2d at 1281 (same); *State v. Brown*, 470 N.W.2d 30, 32 (Iowa 1991) (holding that trial court's admissibility decision regarding expert testimony will be reversed only if discretion abused and defendant suffered prejudice). Of course, the trial court's determination concerning a particular expert's personal qualifications

is reviewed for an abuse of discretion. *See Cauthron*, 846 P.2d at 507.

51. *Porter*, 618 A.2d at 635 (citations omitted).

52. Dr. William Shields, one of the defense experts who testified during the evidentiary hearing, stated that the RFLP method Lifecodes follows is generally accepted in the scientific community. He also testified that after viewing the tested samples, he agreed with Lifecodes's determination that they matched both visually as well as numerically. First Evid.Hrg.Tr.I, p. 166–68. The other defense witness, Dr. Ronald Acton, agreed that the scientific community has generally accepted DNA profiling technology—specifically the RFLP method—but claimed that three controversial areas exist concerning forensic application. Second Evid.Hrg.Tr.II, p. 71. First, there are no standards governing these testing labs. Second, the matching methods different labs utilize are imprecise. Third, the statistical probability calculations are faulty.

53. One pair of commentators have written that "[t]here is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests." Thompson & Ford, *DNA Typing* at 60.

54. Many courts—those following the *Frye* "general acceptance test" and those applying a more liberal rules of evidence type approach such as in *Daubert*—have found specifically that the RFLP analysis Lifecodes followed in this case has been generally accepted in the scientific community. *See Cauthron*, 846 P.2d at 512 (*Frye* analysis); *Axell*, 1 Cal.Rptr.2d at 427 (same); *Smith v. Deppish*, 807 P.2d at 159 (same); *State v. Davis*,

federal [55] court opinions addressing the admissibility of DNA evidence as a forensic tool in criminal cases, we find that the overall theory and techniques of DNA profiling [56]—including those Lifecodes used in this case [57]—are scientifically reliable and relevant under *Daubert* standards.[58] Turning to the first *Daubert* factor under the "scientifically relevant and reliable" prong, there is no doubt that DNA profiling techniques in general and the RFLP analysis specifically have been and can be tested. Secondly, it is clear that they have been subjected to peer review.[59]

Regarding the third *Daubert* factor which focuses on the scientific technique's known or potential rate of error, we note Dr. Baird from Lifecodes testified that the company had submitted to blind proficiency testing to ensure that it was following proper procedures in conducting its DNA profiling analyses.[60] While no figures were given on any known or potential rate of error in the RFLP test procedure, Dr. Baird did testify that mistakes made during this analysis would most likely result in no finding than in a faulty one.[61] Fourth and finally, it is abundantly clear that the concerned scientific community has generally accepted as reliable the RFLP method of DNA profiling utilized

814 S.W.2d 593, 603 (Mo.1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1991) (same); *People v. Miles,* 217 Ill.App.3d 393, 160 Ill.Dec. 347, 577 N.E.2d 477, 483 (1991) (same); *Ford,* 392 S.E.2d 781, 784 (same); *Cobey,* 559 A.2d at 398 (same); *People v. Wesley,* 140 Misc.2d 306, 533 N.Y.S.2d 643, 659 (Co.Ct.1988), *affirmed* 183 A.D.2d 75, 589 N.Y.S.2d 197 (1989); *Snowden v. State,* 574 So.2d 960, 966 (Ala.Crim.App.1990) (*Frye*-plus test); *Castro,* 545 N.Y.S.2d at 999 (evidence passed *Frye*-plus test but was excluded because of improper procedures used by Lifecodes); *State v. Wimberly,* 467 N.W.2d 499, 506 n. 5 (S.D. 1991) (rules of evidence approach); *Kelly v. State,* 792 S.W.2d 579, 583 (Tex.Ct.App.1990), *affirmed,* 824 S.W.2d 568 (Tex.Crim.App.1992) (same); *State v. Pennell,* 584 A.2d 513, 515 (Del.Super.1989) (same); *Martinez,* 549 So.2d at 695, *Spencer v. Commonwealth,* 238 Va. 275, 384 S.E.2d 775, 783 n. 10 (1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); *Pennington,* 393 S.E.2d at 853 (rules of evidence approach which incorporates *Frye* ); *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253, 260 (1989) (same).

**55.** *See Martinez,* 3 F.3d at 1197 (holding that courts may now take judicial notice of the reliability of the general theory and techniques of DNA profiling); *Jakobetz,* 955 F.2d at 799 (same).

**56.** Our admissibility determination does not include the statistical probability component of DNA evidence, which we address *infra.*

**57.** In this case, Lifecodes used the restriction fragment length polymorphism ("RFLP") method to create a profile of Taylor's DNA. While Lifecodes has since made some changes in its profiling technique, the original method employed in this case was not proven unreliable. For a discussion of the seven steps followed in the RFLP analysis, *see* Sweeney, *DNA Typing* at 618–23. *See also Castro,* 545 N.Y.S.2d at 990 n. 3 (listing of numerous articles which support the

court's conclusion that the RFLP analysis has gained general scientific acceptance.).

Another method of DNA profiling is the Polymerase Chain Reaction (PCR) analysis, also known as "DNA Amplification." It is newer and less specific and thus not as widely accepted in the scientific community as the RFLP method. *Id.* at 617. *But see State v. Lyons,* 124 Or.App. 598, 863 P.2d 1303, 1309 (1993) (concluding that "[t]here is no dispute that the PCR method is generally accepted within the field.").

**58.** While this admissibility standard is more flexible than the *Frye* "general acceptance" test this Court has traditionally applied, we note that the evidentiary hearing judge found the DNA match evidence admissible under the stricter *Frye* standard. In the order remanding for evidentiary hearing, this Court directed the judge to answer three questions: first, whether DNA fingerprinting is generally accepted in the scientific community; second, whether the statistical conclusions derived from DNA fingerprinting are generally accepted in the scientific community; and third, whether the procedures used in the instant case comported with the generally accepted scientific procedures and/or techniques.

**59.** According to *Wesley,* 611 N.Y.S.2d at 103, 633 N.E.2d at 457, "no peer review articles have discredited the RFLP procedures used by Lifecodes."

**60.** *See* First Evid.Hrg.Tr. I, 168–69.

**61.** *See* First Evid.Hrg.Tr. I, at 128. Dr. Baird also testified that Lifecodes performs a series of quality control steps during the testing procedure. *Id.* at 127. Two commentators have also noted that the theory underlying DNA typing has been "repeatedly put to the test and has successfully predicted subsequent observations." Thompson and Ford, *DNA Typing* at 60–61. *See also Adams,* 489 N.W.2d at 197 (concluding that "[i]f the laboratory fails to take the proper steps in the procedure, no readable result is visible on the autoradiograph.").

by Lifecodes in this case.[62] After assessing the DNA profiling evidence in accordance with the *Daubert* requirements, we find it was sufficiently reliable to have warranted admission.

 The second prong of the section 2702 test requires that we determine whether this reliable DNA profiling evidence was relevant to the trial issues. Evidence of a match between Taylor's tested DNA profile and the tested crime scene DNA tended to show that the semen found on the victims belonged to him. The main issue at trial was who had left his semen at the crime scene and on the victims. Clearly, the DNA match evidence was pertinent to this inquiry and thus sufficiently relevant to have warranted admission.

 Having determined that the DNA profiling evidence was both relevant and reliable, we must now consider whether its probative value was substantially outweighed by the danger of unfair prejudice.[63] This evidence was highly probative on the issue of the perpetrator's identity. While it did tend to inculpate Taylor, the DNA match evidence was not unfairly prejudicial.

The DNA match evidence in this case was both relevant and reliable. Further, its probative value was not substantially outweighed by the danger of unfair prejudice. It was therefore properly admitted against Taylor.

### B. *STATISTICAL PROBABILITY EVIDENCE*

 Before determining whether the statistical probability evidence presented

against Taylor passes muster under section 2702 as interpreted by *Daubert*, we will briefly describe this component of DNA profiling evidence and trace its path through recent stages of scientific scrutiny. As previously mentioned, this final phase in the DNA profiling process utilizes population genetics to estimate the "probability that a person picked randomly from the population would have a DNA profile identical to the DNA profile generated from the forensic sample...." [64] One court explained it this way:

> Absent laboratory error, a declared match means that only one of the following is true: (1) the samples came from the same individual; (2) the samples came from identical twins; or (3) the samples came from different individuals but, by pure chance, the DNA segments examined match (although comparison of the entire DNA sequence from each individual would not match). **It is the probability favoring a random match (the third of these three alternatives) that provides the telling and crucial bottom line of DNA evidence.**[65]

During the trial in this case, Lifecodes's Dr. Baird testified that the likelihood that an African American other than Taylor contributed the DNA in the semen sample taken from the victims was one in 97 billion. To obtain this figure, Lifecodes's scientists first determined how often each of Taylor's isolated DNA patterns—which matched the patterns from the unknown perpetrator's specimen—occurred among the samples in its African American database.[66] Applying to this data a widely used and well accepted popula-

62. *See supra* n. 52.

63. *See* 12 O.S.1991, § 2403. Neither the trial judge nor the evidentiary hearing judge made an explicit finding under section 2403.

64. Sweeney, *Defending a Process* at 643. *See also* Jonathan J. Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers,* 76 Judicature 222, 224 (Feb.–Mar. 1993).

65. *Bible,* 858 P.2d at 1185 (footnotes omitted) (emphasis added). For a general explanation of the statistical analysis portion of DNA profiling

evidence, *see Axell,* 1 Cal.Rptr.2d 411 at 417–419. An even more detailed discussion can be found in *Castro,* 545 N.Y.S.2d at 992, 999.

66. The frequency with which a particular DNA pattern will occur in a given population is predicted by determining the frequency with which that pattern occurs in the database samples. Dr. Baird testified that Lifecodes's database was derived from random, unrelated individuals who had submitted blood samples for paternity testing. At the time of trial in 1989, Lifecodes's database contained data from African American and Caucasian individuals throughout the United States.

tion genetics principle known as the "product rule,"[67] Lifecodes scientists calculated the final 1 in 97 billion figure.[68]

After Taylor's trial but before the evidentiary hearing, scientists began criticizing the application of the product rule in determining the statistical significance of a DNA match. The primary concern was that incorrect assumptions were being made about the population's mating tendencies and the resulting genetic structure of human populations. If these critics were correct, using the product rule to determine the statistical significance of a DNA match could have resulted in probability figures which greatly underestimated the possibility of a random match between tested DNA samples.[69]

In 1991, *Science*, a leading scientific journal, featured a pair of articles depicting the fundamental disagreement among population geneticists over determining the statistical significance of a DNA match.[70] Several months later, the National Research Council[71] released a report[72] in which "[a] committee of eminent scientists and jurists (hereinafter NRC Committee) [who had] exhaustively researched and analyzed the current status of forensic DNA typing"[73] acknowledged the existence of this substantial controversy concerning popular methods of statistical analysis.[74]

The NRC Committee found that "[c]urrent methods of calculating the probability of a random match rest upon inadequate data and unjustified assumptions about population

67. Experts in this case applied the "product rule" to obtain an estimate of the frequency with which Taylor's tested DNA sequence would occur in the relevant segment of the population. Generally speaking, the frequency with which a particular sequence occurs in the database population is multiplied by the frequency with which each other matched sequence occurs in the database. The final figure represents the estimated odds that another individual would possess all of the tested, matching DNA sequences. *See Cauthron*, 846 P.2d at 513.

68. State's expert Dr. William Shields provided the 1 in 97 billion figure at trial. During the subsequent evidentiary hearing, however, he testified that the final statistical figure in Taylor's case was 1 in 334 billion. This discrepancy inured to Taylor's benefit, since his jury received the more modest 1 in 97 billion figure. Dr. Shields also testified at the evidentiary hearing that using Lifecodes's current, more conservative approach, the final statistical figure in Taylor's case would be 1 in 10 billion. This figure is lower than 1 in 97 billion, but still reflects the great improbability that the match between Taylor's DNA and the DNA obtained from the crime scene and victims was random.

69. Two of the State's experts testified that the population genetics principles (including the product rule) used to calculate the statistical significance of the DNA match evidence against Taylor are universally utilized by population geneticists. As one court has recently stated, "[p]robability calculations such as this are rendered daily in both experimental and theoretical fields of science." *People v. Soto*, 30 Cal.App.4th 340, 35 Cal.Rptr.2d 846 (Cal.App. 4 Dist.1994). Therefore, it is clear that scientists do not question the soundness of the population genetics formulas themselves. Rather, they claim that because of incorrect assumptions about the manner in which populations mate, applying those

standard population genetics formulas to DNA database figures provides unsound statistical results. *See Id.* (noting defendant's argument that "[a]pplication of the product rule—the factor of two in the frequency calculation, ... is ... disputed within the scientific community because of the possibility of ethnic, demographic or cultural substructuring."). For an in-depth discussion of potential problems with substructuring, "linkage disequilibrium" and "Hardy–Weinberg equilibrium," *see Cauthron*, 846 P.2d at 512–517.

70. *Compare* Richard C. Lewontin & Daniel L. Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at p. 1745 and Ranajit Chakraborty & Kenneth K. Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991) Science, at p. 1735.

71. "The National Research Council, which conducts studies and investigations in the public interest, was organized by the National Academy of Sciences in 1916 in order to provide for broader participation by American scientists and engineers in the work of the Academy. The Academy was charted by the U.S. Congress in 1863." *McCarty*, 506 N.W.2d at 146, n. 2.

72. The NRC Committee Report was introduced at the evidentiary hearing in this case.

73. *Cauthron*, 846 P.2d at 504.

74. During the evidentiary hearing, Dr. Baird testified that since Taylor's trial, Lifecodes has taken a more conservative approach in calculating its statistical probability figures. Lifecodes now follows a "straight binning" method of estimating the frequency with which a particular DNA sequence occurs in a database population, rather than the "weighted Gaussian" method it used at the time of Taylor's trial.

substructure."[75] The Committee's temporary solution to the population substructure problem was the "ceiling principle," a conservative formula for computing the statistical component of DNA match evidence that "gave the benefit of every conceivable doubt to the defendant."[76] Predictably, population geneticists and statisticians soon began criticizing this new method of calculating the statistical significance of a DNA match.[77] Most recently and most notably, however, a member of the disbanded NRC Committee discussed the controversy, concluding that "the DNA fingerprinting wars are over."[78]

Taylor's attack on the statistical component of the DNA profiling evidence admitted against him centers primarily on Lifecode's use of the product rule. He claims the NRC Committee Report made clear that the statistical component of DNA match evidence cannot properly be calculated using the product rule. After independently reviewing the evidentiary hearing transcripts in this case, the evidentiary hearing judge's findings and conclusions, numerous articles discussing scientists' views concerning the statistical portion of DNA evidence, and a number of state and federal court opinions addressing the admissibility of the statistical component of DNA

evidence, we find that the statistical evidence presented against Taylor meets the *Daubert* standard of admissibility.

Turning to the first *Daubert* reliability consideration, it is clear that the frequency calculation used in the DNA context has been and can be scientifically tested. Secondly, various methods of computing the statistical significance of a DNA match, including the one used in this case, have been subjected to peer review. The third *Daubert* factor asks whether the technique at issue has a known or potential rate of error. Clearly, scientists have disagreed about whether applying population genetics principles to DNA database figures can produce reliable statistics. Accordingly, some would argue that every resulting statistic is unsound. This does not really provide us with a known or potential rate of error, however, because there is no definitive proof that statistical results derived by applying genetics principles to DNA database figures are in fact flawed.

 Fourth and finally, it appears that the relevant scientific community has generally accepted the application of the product rule in calculating the statistical component of DNA match evidence.[79] One

---

**75.** Kreiling, *DNA Technology* at 462. *But see Porter*, 618 A.2d at 637–38, *quoting* Committee on DNA Technology in Forensic Science, National Research Counsel, *DNA Technology in Forensic Science* (1992 at pp. 12, 80, 94 ("The [Committee] report does not, however, choose sides in the [statistical analysis] debate, but instead 'assumes for the sake of discussion that population substructure may exist. . . .' ").

**76.** Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, Nature (Oct. 27, 1994) 735, 736 [hereinafter "Lander & Budowle"]. Some courts responded to the NRC Committee Report by conditioning admission of DNA statistical evidence on application of the ceiling principle. *See People v. Wallace*, 17 Cal. Rptr.2d 721, 724, 14 Cal.App.4th 651 (1993) (concluding that "new methods of statistical calculation proposed by the National Research Council will likely receive general acceptance resulting in future admissibility of DNA analysis evidence. . . ."); *Vandebogart*, 616 A.2d at 494 (remanding case to trial court for determination of whether ceiling principle is a generally accepted technique). However, two authors agree that the NRC Committee did not intend for the ceiling principle to be used exclusively, but only as "an ultra-conservative calculation [ ] which did not bar experts from providing their own 'best esti-

mates' based on the product rule." Lander & Bowle at 737. The statistical portion of the DNA evidence against Taylor was not calculated using the ceiling principle because that principle had not yet been fashioned.

**77.** *See* Devlin, Risch & Roeder, *Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report* (Feb. 5, 1993) *Science* at p. 748; Aldhous, *Geneticists Attack NRC Report As Scientifically Flawed* (Feb. 5, 1993) *Science* at p. 755.

**78.** Lander & Budowle at 735.

**79.** We note that some courts which have addressed DNA evidence have declined to subject the statistical component to the traditional "general acceptance" admissibility test, concluding that questions about underlying assumptions upon which those statistics were based should be left to the jury. *See Wesley*, 611 N.Y.S.2d at 103, 633 N.E.2d at 457 (concluding that "[d]efendant's challenges to the population studies relied on by Lifecodes to estimate the probability of a coincidental match go not to admissibility, but to the weight of the evidence, which should be left to the trier of fact."); *Springfield*, 860 P.2d at 447 (concluding that "any question concerning the size of the database or the Hardy–Weinberg

court adhering to one version of the strict *Frye* test has also recently found that "substructure" attacks on DNA statistics derived through application of the product rule will not present an obstacle to admission of this evidence. The court in *People v. Soto* noted that several scientific developments since the NRC Committee Report have laid to rest any concern over the use of the product rule in calculating the statistical significance of a DNA match.[80] After considering the DNA statistical evidence in accordance with *Daubert* standards, we find it was sufficiently reliable to have warranted admission.[81]

■ We must now determine under the second prong of section 2702 whether this reliable DNA statistical evidence was relevant to the trial issues. Once the jury heard testimony that the tested portion of Taylor's

DNA matched the tested portion of the crime scene DNA, it had to know the degree to which such a match suggested that the semen left at the scene was in fact Taylor's. The statistical figures admitted reflected how rare it would be to find two people who shared the same genetic patterns at several sites on their DNA strands. These numbers clearly helped the jury appreciate the significance of the DNA match evidence.

■ Having determined that the statistical portion of the DNA profiling evidence was both relevant and reliable, we must consider whether its probative value was substantially outweighed by the danger of unfair prejudice. The "one in 97 billion" statistic was a necessary and probative component of the DNA match evidence because it enabled

equilibrium goes to the weight of the evidence and is properly left to the jury..... [T]he potential impact of substructure on the accuracy of such estimates is, in the final analysis, a matter of weight for the jury to consider, rather than of admissibility."); *Montalbo*, 828 P.2d at 1283 (concluding that "[i]f valid, defendant's objections [to statistical figure] would go to the weight rather than the admissibility of the evidence...."); *Smith v. Deppish*, 807 P.2d at 159 (same); *Axell*, 1 Cal.Rptr.2d at 431 (same).

Other courts have disagreed, concluding that the statistical component of DNA profiling evidence is an integral part of that evidence which must also pass muster under current admissibility standards. See *Watson*, 196 Ill.Dec. at 99, 629 N.E.2d at 644 (concluding that FBI's statistical calculation is subject to *Frye* test); *Nelson*, 628 A.2d at 76 (rejecting the State's overly simplistic argument that statistics go simply to the weight, not the admissibility of the DNA matching evidence); *Porter*, 618 A.2d at 640 (concluding that "[s]ince the probability of a coincidental match is an essential part of the DNA evidence, and since there is no consensus as to the accuracy of the FBI's calculation, we decline to hold that the defense objections to that precise calculation go only to its weight." (Emphasis in original). We agree with those courts which have held that the statistical component of DNA profiling evidence must meet any admissibility requirement imposed on the match evidence, and have analyzed the statistical evidence in this case accordingly.

80. The court found most significant Lander & Budowle's recent conclusion that the DNA fingerprinting wars are over. It also noted that "two famous adversaries to the admission of DNA evidence, Eric Lander and Daniel Hartle recently shifted their position on the issue, accepting the frequency determinations based on the ceiling method along with the product rule

formulation." *People v. Soto*, 35 Cal.Rptr.2d at 357. Finally, the court acknowledged a recent FBI report which concluded that "population substructuring is not 'forensically significant' in estimating the random likelihood of a particular DNA profile." *Id.* at 858 (quoting U.S. Dept. Justice, FBI Rep., *VNTR Population Data: A Worldwide Study*, Vol. IA, p. 2 (1993).

81. We agree with the overwhelming majority of courts and commentators that evidence of a DNA match is not admissible without the accompanying statistical expression of the significance of that match. See *e.g. Lenard v. State*, 796 P.2d 636, 637 (Okl.Cr.1990) ("The actual testing of the blood taken in individual [paternity] cases is meaningless without reference to the ... statistics."). See also *Cauthron*, 846 P.2d at 516 ("Testimony of a match in DNA samples, without the statistical background or probability estimates, is neither based on a generally accepted scientific theory nor helpful to the trier of fact."); *Watson*, 196 Ill.Dec. at 101–02, 629 N.E.2d at 646–47 (same); *Nelson*, 628 A.2d at 76–77 (same); *Fishback*, 851 P.2d at 893, n. 18; *Curnin*, 565 N.E.2d at 442, n. 7 (1991); *Vandebogart*, 616 A.2d at 494 (same); *Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311, 314 (1992) (same); *People v. Barney*, 10 Cal.Rptr.2d 731, 745, 8 Cal.App.4th 798 (1992) (same); DNA Committee Report at 74 ("To say that two patterns match, without providing any scientifically valid estimate ... of the frequency with which such matches might occur by chance, is meaningless."). *But see Caldwell*, 393 S.E.2d at 444 (DNA identification evidence ruled admissible but accompanying statistical figures ruled inadmissible). Thus, if we had concluded that the statistical evidence in this case was inadmissible, we would have been forced to conclude that the DNA match evidence was inadmissible as well.

the jury to appreciate the significance of the match. On the other hand, this Court has recognized "the very real danger that ... probability evidence may have an undue psychological impact on the trier of fact." [82] Further, because a given set of statistics may be somewhat larger or smaller depending upon the particular formula used to calculate them, it is clear that there currently exists some degree of inconsistency in this component of DNA profiling evidence.

While these aspects of DNA statistics could be considered prejudicial, we do not find that they substantially outweigh the probative value of this evidence. Even if the overwhelmingly large numbers arguably convince juries that a match means an accused's DNA specimen and the crime scene specimen are one and the same, juries are still free to weigh all the evidence and conclude that the accused did not commit the crime charged. Clearly, a DNA expert would be forbidden to testify that the evidence proved the accused committed the crime charged. [83]

Finally, the fact that one particular method of calculating DNA statistics might result in a smaller figure than another does not lead us to conclude that all such statistical evidence is more prejudicial than probative. None of the currently accepted formulas result in statistics so significantly divergent that one set of figures would absolutely convince a jury that a match was not random, while another might only suggest to a jury that a match was not random. Rather, each of the several formulas produce statistical results that convey the minimal likelihood

that a match between an accused's DNA and crime scene DNA was random. [84]

Without the statistical component of DNA profiling evidence, juries would be unable to assess the significance of the match evidence. The possible prejudicial effect of these statistics is not unfair and does not outweigh their probative value. After analyzing the DNA statistical evidence under the flexible *Daubert*, we find that it was relevant, reliable and properly admitted against Taylor.

## V. SUMMARY AND CONCLUSION

After reevaluating the *Frye* general acceptance method of determining the admissibility of novel scientific evidence to which this Court has long adhered, we have decided to abandon that test and adopt the more flexible standard fashioned by the United States Supreme Court in *Daubert*. We have concluded after thoroughly and independently assessing the novel DNA profiling evidence in this case, that it meets the *Daubert* relevancy and reliability test. Accordingly, we uphold the evidentiary hearing judge's conclusion that the trial judge properly admitted the DNA match and statistical evidence against Taylor.

 This Court has now independently determined that DNA match evidence obtained through RFLP analysis, and DNA statistics calculated through standard population genetics formulas, pass the *Daubert* test. Therefore, from this point forward, trial courts faced with DNA profiling evidence produced through these means need not conduct a *Daubert* pretrial admissibility hearing. [85] We emphasize that while this evidence

---

82. *Brown v. State,* 751 P.2d 1078, 1079 (Okl.Cr. 1988).

83. There was no such prejudicial testimony in this case.

84. According to Arthur J. Eisenberg, a State's expert who testified at the evidentiary hearing, even those statistical figures which might underestimate the likelihood of a random match do not appreciably overemphasize the fact that random matches are quite rare: "In my opinion, a number of one in a million, one in a hundred million, one in a billion, although it may seem like a tremendous difference, I think it still conveys the idea that the DNA profile is extremely rare." First Evid.Hrg.Tr. II, p. 230. *See also Wallace,* 17 Cal.Rptr.2d at 726 (finding that "it matters

little to a jury whether the odds are one in one million or one in 26 million. Either estimate is devastating to the defendant."). *See also* Lander & Budowle at 738 (concluding that "[c]onservative calculations have had no noticeable impact on the use of DNA evidence. In the vast majority of cases, a jury needs to know only that a particular DNA pattern is very rare to weigh it in the context of a case: the distinction between [astounding but varying] frequencies ... is irrelevant in the case of suspects identified by other means.").

85. In each case involving expert testimony, however, the trial court retains its duty to determine whether a particular witness meets expert qualifications. Trial judges must also ensure that

is now generally admissible, its weight and credibility remain subject to attack through cross-examination and testimonial challenges.

■ On the other hand, a pretrial *Daubert* hearing must be held if a party seeks admission of scientific or technical evidence the reliability of which this Court has not considered.[86] The purpose of this hearing will be to determine whether such evidence is sufficiently "reliable" and "relevant" to warrant admission.[87] This evidence may be considered "reliable" if it is grounded in the methods and procedures of science.[88] The "relevancy" component simply requires that scientific or technical evidence bear a valid scientific connection to the pertinent inquiry and thereby assist the trier of fact in assessing the issues. Finally, the trial court should consider whether the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. This Court will independently review a trial judge's decision admitting or excluding novel scientific or technical evidence to determine whether it passes muster under *Daubert*.

### ADDITIONAL PROPOSITIONS

■ In his third proposition,[89] Taylor claims his convictions for both first degree burglary and first degree robbery violated the prohibition against double jeopardy, since the acts supporting these offenses arose from the same criminal transaction. We disagree. "[B]urglary and other offenses committed within the structure burgled do not merge, and conviction of both does not violate double jeopardy protections." [90] The burglary Taylor perpetrated was complete when he entered the victims' residence with the intent to commit a crime.[91] "The offenses [he] committed after entry [were] separate and distinct." [92] This proposition is denied.

■ Taylor claims in his final, supplemental proposition [93] that the trial court did not properly conduct the post-examination competency hearing to which he was entitled pursuant to 22 O.S.1991, § 1175.4. After an August 16, 1988 hearing on Taylor's application for determination of competency, the trial court ordered the Oklahoma Department of Mental Health to examine Taylor for competency. After the examination, the Department of Mental Health advised the court that Taylor was competent.

On September 2, 1988, the State filed an application for a post-examination competency hearing. Each party was then notified that a hearing would be held. Taylor's attorney did not offer any evidence at the hearing and thus waived any claims supporting Tay-

proponents of expert testimony lay a proper foundation. These matters may be handled at trial unless the trial judge determines in a particular case that the interests of justice would be better served if these details were discussed outside the jury's presence. On appeal, trial judges' decisions concerning expert qualifications and foundational requirements will be reviewed for abuse of discretion.

86. DNA evidence which has been generated through new and different technology fits within this category. *See U.S. v. Martinez,* 3 F.3d at 1197.

87. These requirements are based upon section 702 in the Federal Rules of Evidence and, therefore, its counterpart section 2702 in the Oklahoma Evidence Code.

88. Four factors, neither exclusive nor necessarily dispositive, may aid the reliability determination: first, whether the scientific method at issue has been or can be tested; second, whether the theory has been subjected to peer review; third, whether the scientific procedure has a known or potential rate of error; and fourth, whether the scientific evidence at issue has gained acceptance in the relevant scientific community.

89. In a second proposition, Taylor claims that if this Court found he waived any error concerning admission of the DNA evidence, his trial counsel should be deemed ineffective. After Taylor's initial appellate brief was filed, this Court ordered an evidentiary hearing on the admissibility of DNA evidence and granted Taylor experts at State expense. We have fully considered whether the State's DNA evidence was properly admitted against Taylor. Accordingly, this proposition is moot.

90. *Williams v. State,* 807 P.2d 271, 273 (Okl.Cr. 1991).

91. *Id. See also* 21 O.S.1991, § 1431.

92. *Williams,* 807 P.2d at 273.

93. On October 29, 1990, this Court granted Taylor's motion to file his supplemental proposition of error.

lor's incompetency.[94] The trial judge reviewed the available evidence, determined that Taylor was competent and ordered criminal proceedings to resume. The Assistant District Attorney and Taylor's attorney both signed the Order to Resume Criminal Proceedings.

Taylor now claims the waiver of his right to present evidence of incompetency was invalid. He argues that such a waiver is acceptable only after the trial judge personally observes the defendant, questions him about his understanding of the consequences of the waiver, and makes a final determination that the defendant in fact is capable of waiving his right to present evidence of incompetence. Because Taylor was not present[95] at the post-examination competency hearing, he claims the trial judge could not have made this determination and should not have allowed defense counsel to waive Taylor's rights. We disagree.

A post-examination competency hearing must afford both the State and the defense an opportunity to present and argue evidence concerning the defendant's competency. However, a defendant may choose not to take advantage of that opportunity, either by refusing to present evidence at the hearing or by failing to appear. Taylor does not claim that the trial court failed to notify him of the hearing date or that he was unaware of the doctor's competency determination. Although the record reflects that neither Taylor nor his attorney were physically present at the hearing, defense counsel signed the Order to Resume Criminal Proceedings which clearly stated that the judge had found Taylor competent to stand trial.

We find that Taylor was fully apprised of both the post-examination hearing and the State's evidence supporting competency. He had the opportunity to present evidence at that hearing, but chose to waive it. The judge was under no obligation to evaluate independently whether Taylor was competent to waive his rights. This proposition is denied.

## DECISION

The Judgment and Sentence of the trial court is **AFFIRMED.**

JOHNSON, P.J., and LANE, J., specially concur.

LUMPKIN, J., concurs in results.

STRUBHAR, J., concurs.

JOHNSON, Presiding Judge, specially concurring.

First, I want to compliment the Court on a most thorough, incisive and in-depth study of scientific evidence as it relates to DNA profiling evidence and its submission. The Court has conducted a study of 12 O.S.1981, § 2702 as it relates to expert testimony. Both of these in-depth analyses are done with astute logic and legal reasoning.

This Court in *Bechtel v. State,* 840 P.2d 1 (Okl.Cr.1992) and *Davenport v. State,* 806 P.2d 655 (Okl.Cr.1991), (both opinions of this writer) discussed *Frye* and also Section 2702 of the Oklahoma Statutes. Both of these opinions agreed that *Frye* relates to the general acceptance in the scientific community. These two opinions did not exclude any other test as it relates to the Evidence Code. The Evidence Code, when adopted in Oklahoma, did not mandate the *Frye* test. To the contrary, the Code indicates that an expert may testify as to any parts of the case that would assist the trier-of-fact to understand the evidence and to determine a fact or issue. The Evidence Code per se does not require the *Frye* test.

The opinion is correct when it states (1) that *Frye* is not required and (2) expert evidence may be offered that would assist the jury in understanding the ultimate fact and issue before the jury.

I personally feel that such evidence may be far reaching, even when the evidence or theo-

---

94. *See Doyle v. State,* 785 P.2d 317, 325 (Okl.Cr. 1989).

95. The appeal record does not contain a transcript of the post-examination competency hear-

ing. However, the trial judge's Order to Resume Criminal Proceedings reflects that the only party present at the hearing was the District Attorney.

ry may be relatively new in nature. In fact, under proper circumstances, it could be the first time that an expert has ever testified relative to a theory. This, of course, would have to be scrutinized by the court with utmost discretion.

I agree with Professor Whinery as he analyzed 12 O.S. § 2702. He feels that a clarification of the law as it relates to the Oklahoma Standard governing the admissibility of novel forms of scientific evidence and Section 2702 would be helpful. I agree and this opinion does just that (p. 557). The trial courts should remember that in criminal cases a higher standard of proof is required than in civil cases. Care should be given to see that justice is complied with. However, the strict *Frye* test is no longer the law and the trial court is now free to see that justice can be done with a far wider latitude as to novel scientific evidence provided that same is sufficiently reliable to be held relevant. *State v. Williams*, 388 A.2d 500 (Me.1978).

LANE, Judge, specially concurring.

Prior to the adoption of the evidence code and *Daubert v. Merrell Dow Pharmaceuticals*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) the courts of Oklahoma were content to allow the scientific community determine the scientific reliability of new scientific theories.[1] Today, we shift that responsibility to the trial judge and this Court when criminal matters are being tried, a move that is legally valid but may be ill-advised from a practical standpoint.

By making the judge the "gatekeeper" for the admission of scientific evidence, we are requiring him and not the relevant scientific community to determine if a theory is scientifically valid. This opinion does not eliminate the element of acceptance of the scientific community from the consideration, but it adds other factors that are a part of the testing procedures used by the scientific community such as whether the theory has been tested and can it be tested; has it been subject to peer review and publication; and, what is the known or potential rate of error. During the consideration of this case we dealt with such terms as "product rule",

"linkage disequilibrium", "Hardy–Weinberg equilibrium", "population substructure", "ceiling principle", "frequency calculation", "deoxyribonucleic acid", "polymorphic sequence" and "polymorphisms". Even with a dictionary open at my side I felt completely inadequate to interpret the scientific reliability of the theory because of my lack of proper skill and training. Heaven help us if a case comes along that relies on sub-atomic physics.

The legal analysis used by the majority is correct. Since my concern is with the practical application of the results, I recommend that the legislature and the practicing members of the bar seriously consider what we have done and determine if new legislation is needed.

LUMPKIN, Judge, concurring in result.

I concur with the Court's affirming the judgments and sentences in this case, and agree with the Court's determination the DNA evidence is admissible based on the standard set out in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923)

In addition, I complement my colleague on an extremely well-researched opinion. Based on the decision in *Daubert v. Merrell Dow*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), together with the language in Section 2702 of the Oklahoma Evidence Code, I agree the opinion of the Court finds support in the law, if the issue were properly before the court at this time.

However, merely because the United States Supreme Court has made a determination of the procedure to be utilized in Federal Courts, it does not mean the State of Oklahoma must follow in trace. Footnote 22 in the Court's opinion recognizes the hesitancy of other state appellate courts to summarily adopt the *Daubert* methodology.

In this case the DNA evidence was admitted pursuant to a *Frye* standard and this Court has determined both the *Frye* standard was met and the admission proper. The applicability of *Daubert* was not presented to the trial court or raised in the briefs

---

1. The repetitive use of the word "scientific" is intentional.

filed with this Court. Therefore, the Court's discussion, and adoption, of *Daubert* can be construed as nothing more than dicta. This Court should not give advisory opinions nor create issues where none exist.

In addition, prior to adopting a new procedure the Court should have before it a record which will allow the Court to assess the impact the procedure will have on the trial courts.

However, since the Court has reached out to bring *Daubert* into our jurisprudence, whether as dicta or holding, some discussion of the potential impact is warranted.

Justice Blackman, in *Daubert*, incorporated a statement of faith in the federal judiciary to be able to administer the *Daubert* admissibility procedure. *Id.* at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. This statement was more appropriately placed in perspective by Chief Justice Rehnquist in his separate opinion. *Id.* at ——, 113 S.Ct. at 2799, 125 L.Ed.2d at 487. I have no doubt the judges of the Oklahoma judicial system also have the inherent qualities and abilities to apply these same procedures if armed with the same resources which are afforded to federal judges. However, as the Court seeks to move the validation of scientific theory from the laboratory to the courtroom, certain pragmatic considerations should be addressed.

Initially, it should be noted state courts are tasked with the administration and resolution of over 98% of all litigation in the United States today. See Schwarzer & Wheeler, On the Federalization of the Administration of Civil and Criminal Justice, 23 STETSON LAW REVIEW 651, 681 (1994). Justice Blackman's comments concerning faith in the federal judiciary to administer the *Daubert* process must be placed in perspective. Federal judges have virtually unlimited resources when compared to state court systems. Judges on the federal level are afforded law clerks and support personnel to assist them in their administrative and adjudicatory duties. In addition, federal judges have utilization of Federal Rule 706, which was not incorporated into the Oklahoma Evidence Code, for the appointment of an independent expert to assist in the evaluation of these "novel" scientific theories. Armed with these many resources, the federal courts only are required to address 2% of the litigation in the United States today. Federal courts are limited jurisdiction courts with jurisdictional thresholds that limit the types of litigation brought to the Court. The District Courts of the state of Oklahoma are general jurisdiction trial courts and are empowered to adjudicate all issues in law and equity brought before them.

The procedure the Court seeks to adopt today applies to a broad range of issues which come within the scope of Section 2702 of the Oklahoma Evidence Code. Simply put, this means that judges in domestic, as well as criminal and civil, cases may be confronted with the time-consuming process of adjudicating admissibility issues which previously have been determined in the laboratory of the respective scientific communities. Few judges on the federal or state bench are endowed with the educational and experiential background to be able to determine the technical validity of scientific theory.

In this day and age it is extremely difficult to initially determine the validity of a "novel" scientific theory, as opposed to the mere marketing of a new entrepreneurial methodology for use in the legal arena. The trial of lawsuits has tragically evolved into a process of one-upmanship, with one party trumping opposing party's experts with its own expert. Apparently, litigants believe there is virtually nothing in this day and age a trier of fact can determine without an expert's assistance. This is graphically exemplified by the page after page of expert witness listings in most legal publications today. The bottom line on the *Daubert*-type methodology is the best sales person will be determined reliable, and each court in this state will be required to spend insurmountable amounts of time serving as the laboratory for each new theory which comes down the pike. I do not find it appropriate for this Court to unduly yoke trial judges with the burden of determining the scientific validity of each and every "blue-light special" (similar to the five-minute specials offered by discount stores) which the marketers of expert opinion seek to impose upon our judicial system. We should contin-

ue to require some threshold validity determination within the appropriate scientific community to preclude erosion of the validity of the judicial process.

I do find it somewhat ironic the *Daubert,* and now the *Taylor* decision, seek to place the trial judge in the role of the laboratory scientist verifying the scientific theory presented to the Court; yet at the same time, substantially, applying the *Frye* standard on appellate review. Whatever the label, an appellate court, which is bound to the evidentiary record presented in the trial court and which verifies the trial court's decision through the use of peer review writings and analysis from other courts, is substantially applying the *Frye* standard.

Before placing this type of requirement on the trial judges of the state of Oklahoma, this Court, together with the Supreme Court of the State of Oklahoma, should work to ensure the Oklahoma Legislature provides funding to allow trial judges the resources needed to conduct these types of preliminary determinations. The Oklahoma Legislature should adopt the provisions of Rule 706 of the Federal Rules of Evidence.

In addition, the statutory language should not only permit the use of court-appointed experts by trial courts, but also create the procedure for their appointment, the scope of their role in serving as a court-appointed expert, and provide for appropriate compensation and funding. If the Oklahoma Legislature truly envisioned and intended the results that have been determined by this decision pursuant to Section 2702 of the Oklahoma Evidence Code, then it should ensure the judges of the District Courts have the resources available to administer this type of procedure. In addition, the Oklahoma Legislature should provide access to appropriate research tools for each judge in the District Court of the state of Oklahoma and support personnel to allow them to accomplish the requirements of determining "reliability" of "novel" scientific evidence. The Legislature should also ensure funding is provided to allow trial judges to attend Continuing Legal Education courses which will provide them the educational base to address the evalua-

tion of the reliability of specialized areas of this type.

I realize under the present system these issues do not arise that often. However, under the basic "law of cause and effect", this decision could be a potential GATT (General Agreement on Tariffs and Trade) and NAFTA (North American Free Trade Agreement) rolled into one for aspiring courtroom experts. This is especially true in the field of psychiatry and psychology, where it seems a new syndrome is born each hour of the day. As a result, trial courts should be sufficiently funded and staffed to meet the additional demands which may be presented to them.

Extended hearings to determine the "reliability" of new scientific theories will steal time a judge should spend on other proceedings. These additional hearing requirements overburden already overcrowded dockets. Additional resources should be provided to meet those needs. But, if the Legislature did not intend the results that have been reached via *Daubert* and this decision, the Legislature should act to sufficiently restrict the application of Section 2702 expert testimony to require a foundation be laid prior to the admissibility of the opinion evidence.

Contrary to the Court's statement concerning the appropriate standard of review, I do not find current jurisprudence inconsistent in determining the scope of appellate review. We consistently apply a presumption of regularity to the trial court proceedings, absent some specific showing to the contrary. See *Huntley v. State,* 750 P.2d 1134, 1136 (Okl.Cr.1988); *Hayes v. State,* 738 P.2d 533, 543 (Okl.Cr.1987); *Gray v. State,* 650 P.2d 880, 883 (Okl.Cr.1982). It is from this presumption that we review evidence in the light most favorable to the trial court's ruling. See *Black v. State,* 871 P.2d 35, 43 (Okl.Cr.1994). I do agree we review caselaw from other jurisdictions, together with legal, scientific and other writings, to formulate the jurisprudence which will be applied in the courts of this state. However, that methodology on appellate review does not obviate the presumption of regularity, nor the review for abuse of discretion. If we are placing the role of "gatekeepers" on the trial judges of this state for the admissibility of evidence

then we must place full faith and credit in their abilities and not initiate a process that seeks to second-guess their decision making process.

In addition, a basic responsibility of the party seeking the admission of evidence in the course of a trial is to establish a proper foundation in law and fact for admitting the evidence. It is outside the scope of an appellate court's authority to fill the gaps in the evidence presented to support or deny the admissibility of evidence at the trial level. Being ever mindful of the limitations placed on the scope of appellate review, we should refrain from establishing legal precedent which dilutes the responsibility of the party offering the evidence to ensure the evidence presented supports the admission of the evidence.

The admissibility of DNA evidence includes the admissibility of statistical probability evidence relating to the DNA match. However, this authorization is limited to the narrow application within the confines of DNA evidence. Trial judges and attorneys should not perceive the narrow application in this case as a *carte blanche* authorization for the admissibility of statistical probability evidence.

In summary, I agree the enactment of the Oklahoma Evidence Code, particularly Section 2702, supersedes the *Frye* requirements of admissibility of novel scientific evidence. However, this Court should still require the party seeking admission of evidence to be responsible to establish admissibility through sufficient evidence in the trial court record; and that record should bind this Court in determining whether the trial judge abused his or her discretion in admitting or denying the evidence based on the evidence presented to the trial court.

Finally, this Court should always consider the impact of procedures adopted on the trial courts of the state of Oklahoma and fashion new rules of procedure which will allow the trial courts to implement those procedures within the confines of resources available to the courts.